THOMAS, the LORD OF SHALFORD; and Linda, the Lady of Shalford, Plaintiffs,

v.

SHELLEY'S JEWELRY, INC. d/b/a Shelley's Auction Gallery; Joette M. Humphrey; John F. Laughter; Billy R. Ramsey; Keith G. Shelley; Stanley R. Shelley, Defendants.

No. 1:99CV162.

United States District Court, W.D. North Carolina, Asheville Division.

Dec. 28, 2000.

Thomas, Lord of Shalford, pro se.

Linda, Lady of Shalford, pro se.

Frank J. Contrivo, Asheville, NC, Andrew J. Santaniello, Asheville, NC, for Shelley's Jewelry, Inc., Joette M. Humphrey, John F. Laughter, Billy R. Ramsey, Keith G. Shelley, Stanley R. Shelley.

R. Steven Rawls, Tampa, FL, for Jewelers Mut. Ins. Co.

### MEMORANDUM AND ORDER

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the Defendants' motion for summary judgment which is opposed by the Plaintiffs. For the reasons stated herein, the Defen-

dants' motion is granted and the action is dismissed.[1]

## I. PROCEDURAL HISTORY

In August 1999, the Plaintiffs' action was transferred to this District by the United States District Court for the Middle District of Florida. After the Plaintiffs were allowed to amend the complaint twice, the Defendants moved to dismiss the action. In November 1999, the Magistrate Judge stayed a ruling on that motion pending an opportunity for the parties to mediate their dispute. When mediation was unsuccessful, the motion was considered and ultimately, 13 of the 17 claims asserted by the Plaintiffs were dismissed. The remaining claims which are attacked by the Defendants' current motion are (1) breach of fiduciary duty; (2) auctioneer malpractice; (3) breach of contract; and (4) breach of the covenant of good faith and fair dealing.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine issue of material fact and judgment for the moving party is warranted as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving parties, here the Plaintiffs. *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, the Defendants as the moving parties have the initial burden to show a lack of evidence to support Plaintiffs' case. *Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91

L.Ed.2d 265 (1986)). If this showing is made, the burden then shifts to the Plaintiffs who must convince the Court that a triable issue does exist. *Id.* Such an issue will be shown "if the evidence is such that a reasonable jury could return a verdict for the [Plaintiffs]." *Id.* A "mere scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* Moreover, in considering the facts for the purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to the Plaintiffs, as the nonmoving parties. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. FINDINGS OF FACT

The following facts are taken from the Plaintiffs' second amended complaint, filed September 30, 1999. In the spring of 1998, Plaintiff Thomas, The Lord of Shalford (Thomas), was seriously ill due to renal failure.[2] Second Amended Complaint, filed September 30, 1999, at ¶ 10. As a result, he determined to sell his estate which consisted of antiques, jewelry, books, collectibles and the lordship of a land barony in England.[3] *Id.* He contacted Defendant Shelley's Auction Gallery (Shelley's) in Hendersonville, North Carolina, about such a sale. *Id.* The parties agreed that Shelley's would complete the auction by August 1, 1998, and would expend a minimum of $10,000 in advertising for the sale. *Id.,* at ¶ 11. On June 9, 1998, the parties entered into a contract which provided that Shelley's would prepare and conduct the sale, keep accurate records thereof, expend a minimum of $10,000 in advertising and marketing expenses, and

---

1. Because the Plaintiffs are proceeding *pro se,* the Court issued an order pursuant to *Roseboro v. Garrison,* 528 F.2d 309 (4th Cir.1975), outlining the procedure Plaintiffs were required to follow in responding to the Defendants' motion for summary judgment. No response was filed by the Plaintiffs.

2. Plaintiffs are referred to respectively as "Thomas" and "Linda." See, Deposition of Thomas, Lord of Shalford, at 30 ("[Y]ou are

welcome to refer to me as Thomas. You are welcome to refer to me as Lord Shalford. It would be both inappropriate and incorrect to identify me as Mr. Shalford. That is a political estate that I do not enjoy.").

3. It is not clear whether Thomas, who is American, purchased this title himself or inherited it.

receive as compensation 12.5 percent of the gross selling price of the property. Exhibit B, *attached to* Second Amended Complaint. Because the property was stored at more than one location, it was agreed that it would be inventoried upon its delivery to Shelley's. *Id.* Thomas was to pay a $1,000 pick-up fee to Shelley's from the sale proceeds. *Id.* Thomas included an addendum to the contract which incorporated his letter to Shelley's of June 8, 1998. *Id.* That letter contained the following language:

> Bill [Ramsey] was informed of our previous auction and retail gallery exhibit sales beginning (sic) 1988; and, not withstanding, we still have much property remaining. He acknowledged our direct, personal involvement in the organization and direction of the marketing aspect of those sales, and that we are best-qualified to plan any future advertising and promotional programs for the property to be sold.

Letter dated June 8, 1998, *attached to* Exhibit B, *attached to* Second Amended Complaint. When Thomas returned the executed contract to Shelley's, he pointed out that his wife, Linda, "is a North Carolina licensed auctioneer (and Florida) of twenty-plus years experience including, of course an awful lot of packing!" Letter dated June 10, 1998, *attached to* Exhibit B. Shelley's did not accept this addendum; however, Thomas went forward with the contract as executed. Second Amended Complaint, at ¶ 18. It was determined to conduct the auction on July 16, 17, and 18, 1998. *Id.*, at ¶ 28.

Prior to that time, Plaintiff Linda, The Lady of Shalford (Linda), attended an auction being held at Shelley's during which a preview of the Plaintiffs' estate was held. *Id.* Linda "was and is an auctioneer of twenty years experience licensed in North Carolina and other jurisdictions; author of several auction instruction and reference texts; and a South Carolina auctioneer continuing education instructor." *Id.* She did not approve of the auctioneering style

of Bill Ramsey, who was employed by Shelley's, and the Plaintiffs so informed Shelley's. *Id.*, at ¶ 30. In fact, the Plaintiffs asked that a less experienced auctioneer conduct their sale. *Id.* Plaintiffs also did not approve of the manner in which their property was packed and transported by commercial movers, its delivery to Shelley's, and its handling during unpacking once at Shelley's. *Id.*, at ¶'s 31–32. Both Plaintiffs were present during the delivery and inventorying of the property and expressed much concern over the personnel who handled the property, the lack of security thereof and other matters. *Id.*, at ¶'s 24–32. The next day, June 23, 1998, Shelley's owner, Stanley Shelley, advised the Plaintiffs that he did not want to conduct the auction of their property. *Id.*, at ¶ 33. One of the reasons given was that he did not believe the property could be sold for more than $60,000, although the Plaintiffs had represented the value as exceeding $200,000. *Id.*, at ¶'s 10, 33. Plaintiffs removed their property and placed it in temporary storage. *Id.*, at ¶ 35.

The following facts are taken from the Plaintiffs' depositions. During 1996 and 1997, Plaintiffs had conducted, with the help of an unidentified gallery, an exhibition and sale of their property in Greensboro, North Carolina. Deposition of Thomas, The Lord of Shalford, dated October 3, 2000, at 10. However, those sales, although successful, were slow and there were prohibitive costs in connection with the exhibition. *Id.* Plaintiffs determined that an auction would produce more immediate cash; however, despite the value of their estate, they determined not to use Sotheby's or Christy's because they did not want to have "tabloid publicity." *Id.*, at 11. Prior to contacting Shelley's, the Plaintiffs had entered into an agreement with Atlanta Art Galleries to auction their estate. *Id.*, at 12. That sale was publicized in trade journals; however, "at the last minute, there was a disagreement over the payment of critical costs." *Id.* As a result, that auction did not take place.

When the auction at Shelley's also did not take place, Plaintiffs retained a commercial liquidator in Concord, North Carolina, which sold approximately one-third of the property which was to have been sold by the Defendants. *Id.*, at 16–17. That sale occurred on January 20 and 21, 1999. *Id.* The total amount grossed from the sale was approximately $100,000. *Id.*, at 18. Plaintiffs are now in a dispute with that liquidator concerning the sale of their property. *Id.*, at 20. One of the issues in dispute is whether all of the property delivered to the liquidator was in fact sold. *Id.*

Since that sale in early 1999, Plaintiffs have not sold any more of their estate. *Id.*, at 21–22. In fact, the property sold in 1999 was not the most valuable part of their estate. *Id.* The remaining two-thirds of their estate is on indefinite loan to the Charlotte Museum of History in Charlotte, North Carolina. *Id.*, at 22–23. The January 1999 sale alleviated the cash crisis which the Plaintiffs felt they were facing. *Id.* Moreover, at some point after 1998, Thomas received a kidney transplant which alleviated his health crisis although he continues to have medical problems. *Id.*, at 8.

Although both Plaintiffs were licensed auctioneers, they did not conduct the auction themselves because they needed a location and personnel to assist in the actual sale. *Id.*, at 23–25. Thomas admitted that Shelley's rejected his addendum which required that he and his wife play an active role in the sale. *Id.*, at 28. However, it remained his understanding that Shelley's had agreed they could play such a role; and, in fact, he would not have entered into the contract had that not been his understanding. *Id.*, at 34. It was also essential that Shelley's have a facility large enough to house the property and sufficient experienced personnel to handle, catalog and inventory all the items. *Id.*, at 35. In addition, it was essential that Shel-

ley's have transportation which would safely move the property to Hendersonville. *Id.*, at 36. Thomas would not have entered into the contract if Shelley's could not use their own trucks, rather than a commercial mover.[4] *Id.* And, although Ramsey, Shelley's auctioneer, declined to personally view all of their property prior to making the contract, the Plaintiffs provided him with photographs thereof. *Id.*, at 44.

When Stanley Shelley announced that he would not auction the Plaintiffs' property, Thomas was shocked. *Id.*, at 49–50. The only reason given was that he and his appraiser, Helen Nash, had looked over the property once unpacked and determined it could not bring more than "$50,-000 or $60,000, $70,000." *Id.*, at 49. Rather than inferring that it was not worth it to Shelley's to auction property of such a small value, Thomas took this to mean that Stanley Shelley intended to purchase Plaintiffs' property at a "rock bottom" price. *Id.*, at 52. Shelley's agreed to continue the auction without an additional expenditure for advertising but Thomas did not respond to this suggestion.

A day or so later, Thomas told Stanley Shelley that if Shelley's would pack up the property and transport it back to its prior location, he would forget the incident. *Id.*, at 54. However, Stanley Shelley refused to do so. *Id.* Plaintiffs did obtain possession of their property; and, as noted, ultimately auctioned about one-third of it.

During the deposition, Thomas was asked to specify the damages he and his wife have sustained as a result of the alleged breach of contract by Shelley's. He answered that he could not give an answer because "that term [damages] can comprehend a lot of things." *Id.*, at 58. As examples, he listed the problem of "obtaining possession of our property, securing it, finding a place to store it," physical and emotional harm, the difficulty of find-

---

**4.** One of the Plaintiffs' complaints is that a commercial mover was used to transport their property to Shelley's Hendersonville location.

ing a replacement auction source, the loss of sale value "versus the ultimate disposition of the property, which has not been yet accomplished." *Id.*, at 59–60. However, he could not assign a dollar amount to damages; and, although he claimed to have documentation to support the losses, he did not produce it. *Id.* Thomas also testified that he understood he would have to do these things, "and it shall be done." *Id.*, at 61. However, Thomas had no such documentation at the deposition and none was produced in response to the Defendants' discovery requests. *Id.*, at 63. Thomas was unable to distinguish damages for a breach of contract from those for breach of a fiduciary duty and he had no documentation to support those damages. *Id.*, at 67, 70.

Thomas testified that in 1990 Bill Ramsey pled guilty to three felonies in Florida involving the misappropriation of auction proceeds. *Id.*, at 72–73. He did not report these convictions to the North Carolina Auctioneer Licensing Board. *Id.*

## IV. DISCUSSION

### A. Plaintiffs' claim for breach of fiduciary duty.

 In the second amended complaint, Plaintiffs' based their cause of action for breach of fiduciary duty on the Defendants' alleged violations of N.C. Gen. Stat. § 85B–1, *et. seq.*, a statute which provides for licensing and regulation of auctioneers by a commission. In their response to the motion for summary judgment, they also claim the fiduciary duty arose from the contract between the parties.

> [I]n North Carolina, "parties to a contract do not thereby become each others' fiduciaries; they generally owe no special duty to one another beyond the terms of the contract and the duties set forth in the U.C.C." . . . Moreover, the

North Carolina Court of Appeals has also said:

> Our review of reported North Carolina cases has failed to reveal any case where mutually interdependent business [people], situated . . . [in equal bargaining positions and at arms' length], were found to be in a fiduciary relationship with one another. . . .

North Carolina law requires a degree of "superiority and influence" to have developed as a result of [ ] interdependence in order to hold one party to a fiduciary's responsibilities. Though plaintiffs . . . would portray [themselves] as helpless Davids to the [Defendants'] Goliath, size, as that story teaches, is not a reliable indicator of strength or influence. Nor is it what North Carolina courts mean by superiority. Only when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the "special circumstance" of a fiduciary relationship has arisen. By all lights, [Plaintiffs] are independent, sophisticated, if [ ] small business [people] who dealt with [Defendants] at arms' length and pursued their own business interests. [T]hese circumstances do not give rise to a fiduciary relationship.

*Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 347–48 (4th Cir. 1998) (quoting *Branch Banking & Trust Co. v. Thompson*, 107 N.C.App. 53, 418 S.E.2d 694, 699–700 (1992) and *Tin Originals, Inc. v. Colonial Tin Works, Inc.*, 98 N.C.App. 663, 391 S.E.2d 831, 833 (1990)) (other citations omitted). Thus, to the extent Plaintiffs base this claim on a contractual relationship, it must be dismissed.[5]

Plaintiffs also claim that the Defendants' obligations as auctioneers to abide by N.C. Gen.Stat. § 85B–1, *et. seq.*, created a fiduciary relationship. It is first noted that

---

5. For the reasons stated *infra*, the undersigned rejects the Plaintiffs' distinction between businesses and themselves because it is without dispute that both are experienced business people in the business of auctions and auctioneering.

the statute itself does not prescribe such a relationship. Indeed, the state legislature did not create a cause of action by virtue of the statute. Instead, the legislature granted the authority to impose penalties for improprieties to the commission created to oversee the industry. See, *e.g.*, N.C. Gen. Stat. §§ 85B–3, 85B–3.1, 85B–4.12, 85B–8, 85B–9. And, although Plaintiffs could have filed a complaint with that commission, they did not do so. N.C. Gen.Stat. §§ 85B–3.1, 85B–4.5, 85B–8, 85B–9.

In North Carolina, a fiduciary relationship exists where "there has been a special confidence reposed in one who in equity and good conscience is bound to act in faith and with due regard to the interests of the one reposing confidence." *Bumgarner v. Tomblin*, 92 N.C.App. 571, 575, 375 S.E.2d 520, 523 (1989) (citations omitted). "The existence or nonexistence of a fiduciary duty is often a question of fact for the jury. However, as a matter of law, no fiduciary relationship exists in the instant case based upon 'special circumstances' resulting in one party having 'superiority and influence' over the other." *Rhone–Poulenc Agro S.A. v. Monsanto Co.*, 73 F.Supp.2d 540, 546 (M.D.N.C.1999) (citations omitted). By the Plaintiffs' own admissions, both of them are sophisticated business people with years of experience in auctions and auctioneering. Both of them hold auctioneering licenses; for over 20 years, Plaintiff Linda's business was that of auctioneering. Indeed, during the negotiation of the contract with Shelley's, Thomas clearly advised the Defendants of their experience. "Bill [Ramsey] was informed of our previous auction and retail gallery exhibit sales beginning (sic) 1988 .... He acknowledged our direct, personal involvement in the organization and direction of the marketing aspect of those sales ...." Letter dated June 8, 1998, *supra*. And, Thomas took care to point out that Linda "is a North Carolina licensed auctioneer (and Florida) of twenty-plus years experience ...." Letter dated June 10, 1998, *supra*. Indeed, Linda was not only an auctioneer, but the author of

auction instruction and reference texts and an auctioneer continuing education instructor. *Id.*

Moreover, this was not the Plaintiffs' first experience in hiring auctioneers to sell portions of their estate. A large portion of the estate was sold in 1988 and at the time of contacting the Defendants, Plaintiffs had an on-going relationship with a gallery in Greensboro. Despite the fact that they were doing an "excellent" job, their speed was too slow for the Plaintiffs' current cash flow concerns. Prior to contacting Shelley's, the Plaintiffs entered into an agreement with Atlanta Art Galleries to auction their estate. Thomas Deposition, *supra*. That auction also did not take place because, despite much advertising, "at the last minute, there was a disagreement over the payment of critical costs." *Id.* And, when the agreement with the Defendants "fell through," Plaintiffs wasted no time hiring another firm resulting in yet another dispute.

Based on these facts, the undersigned finds as a matter of law that there are no "special circumstances" whereby the Defendants had "superiority and influence" over the Plaintiffs. Indeed, the Plaintiffs testimony and pleadings clearly state their belief in their superior knowledge and skills in the auctioneering arena. As a result, this cause of action is dismissed.

## B. Plaintiffs' claim for occupational malpractice.

Plaintiffs' claim for occupational malpractice is asserted only against Defendants Ramsey and Humphrey. Ramsey is alleged to have failed to properly view the estate property prior to entering into the contract. Defendant Humphrey is alleged to have signed the contract on behalf of Shelley's. The complaint also alleges that Ramsey conducted an auction unrelated to the Plaintiffs and was assisted by Humphrey. However, that auction had no impact on the Plaintiffs except to provide Linda with an unfavorable opinion of Ram-

sey causing her to ask for Humphrey to act as the auctioneer for their estate. Humphrey is also alleged to have allowed her children to assist in moving pieces of the Plaintiffs' property.

■ First, as noted above, in Chapter 85B, captioned "Auctions and Auctioneers," the legislature did not create a private cause of action. Instead, a recovery fund was established from which victims could seek reimbursement if: (1) the aggrieved person has sued the auctioneer and filed notice with the commission within 60 days thereof; (2) the aggrieved person "has obtained final judgment in a court of competent jurisdiction against the licensee *based upon conversion or other fraudulent conduct* ... which judgment shall show the amounted owed ...;" (3) the victim was innocent of wrongdoing; and (4) the judgment has been executed but not collected. N.C. Gen.Stat. § 85B–4.2 (emphasis added). Thus, the language of the statute requires the victim to show a successful lawsuit based on conversion or fraudulent conduct, not malpractice or negligence.

■ The undersigned has found no North Carolina case recognizing a cause of action for auctioneer malpractice. Indeed, although Plaintiffs have captioned their claim alternatively as occupational malpractice, state cases indicate that North Carolina courts would not find auctioneering falls within the realm of malpractice, as opposed to common law negligence, a claim which has already been dismissed. "In order to assert a professional malpractice claim, plaintiff[s] must establish (1) the nature of defendant[s'] profession, (2) defendant[s'] duty to conform to a certain standard of conduct, and (3) breach of the duty proximately caused injury to [plaintiffs]". *Reich v. Price,* 110 N.C.App. 255, 258, 429 S.E.2d 372, 374 (1993). As recently as this year, the North Carolina Court of Appeals has held that:

> "[p]rofessional services" has been defined by this Court to mean an act or service arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor [or] skill involved is predominantly mental or intellectual, rather than physical or manual.

*Taylor v. Vencor, Inc.,* 136 N.C.App. 528, 530, 525 S.E.2d 201, 203 (2000) (citations omitted); *accord, Lewis v. Setty,* 130 N.C.App. 606, 608, 503 S.E.2d 673, 674 (1998) ("[P]rofessional services encompass work that is predominately intellectual and varied in character (as distinguished from routine mental, manual, mechanical or physical work." (citations omitted))). Even the statute of limitations for malpractice actions reads only in terms of "professional" malpractice. N.C. Gen.Stat. § 1–15(c) ("[A] cause of action for malpractice arising out of the performance of or the failure to perform *professional services* ...."); *Doe v. American Nat'l Red Cross,* 798 F.Supp. 301 (E.D.N.C.1992) (In order for the statute of limitations to apply there must first exist professional services.).

■ Despite the fact that auctioneers are required by statute to be licensed in North Carolina, the undersigned cannot conclude their services fall within the realm of professional services, such as those performed by physicians, attorneys, architects and others who achieve their status by virtue of long and often arduous educations and apprenticeships. Nor has the undersigned found any other state which recognizes auctioneers as a profession. Indeed, the cases indicate a blatant attempt to stem the tide that would call every job a profession. *See, e.g., Talbot v. Kirkup,* 2000 WL 1474582, *9 (Conn.Super.2000) ("The fact that an occupation is licensed or even closely supervised, however, does not argue for the rationality of creating a case of action for professional malpractice by day care providers."); *Santiago v. 1370 Broadway Assoc., L.P.,* 264 A.D.2d 624, 695 N.Y.S.2d 326 (N.Y.App. Div.1999) (A professional malpractice claim involves an occupation associated with long-term educational requirements leading to an advanced degree, licensing quali-

fications and control thereof by standards of conduct, ethics and malpractice liability. Although licensed and regulated, the occupation of insurance broker does not fall within this category.); *Doe v. White*, 97 Ohio App.3d 585, 647 N.E.2d 198 (1994) (Ohio does not recognize a cause of action for malpractice against crisis counselors.); *Tolman v. CenCor Career Colleges, Inc.*, 851 P.2d 203 (Colo.Ct.App.1992) (Colorado does not recognize a cause of action for educational malpractice.); *Campbell v. Beliscus*, 1989 WL 110806, *2 (Ohio Ct.App. 1989) ("Whether the appellee, [ ] was a jeweler, a laboratory technician, a pseudo-dentist, an immigrant or a gypsy, it is clear from the record that her occupation was not one enumerated by law or falling within the common-law definition of malpractice ...."); *Dennis v. Robbins Funeral Home*, 428 Mich. 698, 411 N.W.2d 156 (1987) (Morticians, although a licensed and regulated occupation, is not a traditional profession falling within the malpractice statute of limitations.); *Natsch v. City of Southfield*, 154 Mich.App. 317, 397 N.W.2d 294 (1986) (Emergency medical technicians were not professionals.); *Hocking Conservancy District v. Dodson Lindblom Assoc., Inc.*, 62 Ohio St.2d 195, 404 N.E.2d 164 (1980) (Negligence of professional engineer did not constitute malpractice.); *Norling v. James*, 38 Mich.App. 96, 195 N.W.2d 776 (1972) (Cosmetologist, although an occupation, was not a profession within meaning of malpractice statute of limitations.). This claim, therefore, is also dismissed.

**C. Plaintiffs' claims for breach of the covenant of good faith and fair dealing and breach of contract.**

█ The North Carolina "Supreme Court has recognized that '[i]n every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement.'" *Murray v. Nationwide Mutual Ins. Co.*, 123 N.C.App. 1, 19, 472 S.E.2d 358, 368 (1996) (quoting *Bicycle Transit Authority, Inc. v. Bell*, 314 N.C.

219, 228, 333 S.E.2d 299, 305 (1985)). Plaintiffs' fourteenth cause of action for breach of the covenant of good faith and fair dealing is "part and parcel" of their claim for breach of contract. *Id.; accord, Polygenex Int'l, Inc. v. Polyzen, Inc.*, 133 N.C.App. 245, 251, 515 S.E.2d 457, 461–62 (1999) (affirming lower court's sanction against plaintiff for filing claim for breach of covenant of good faith because absent a breach of the contract, there is no cause of action for breach of an implied covenant of good faith). Thus, this cause of action will be considered simultaneously with the claim for breach of contract.

Defendants' motion for summary judgment is based on the Plaintiffs' failure to adduce any evidence of damages. In response, Plaintiffs claim they alleged damages exceeding $75,000 in their complaint. In addition, they claim documentation of those damages was provided during the deposition and is referenced at pages 16–22 and 62–63 of Thomas' deposition. In those references, Thomas testified that due to Shelley's breach of contract, they were forced to have a liquidation of one-third of their estate instead of an auction. The liquidation, during which 943 items were sold for a gross profit of $111,544, resulted in the receipt of lower prices for the items sold. However, the items sold during the liquidation did not represent the most valuable portion of the estate. Thomas acknowledged that the Defendants had previously made requests for the production of documents. In fact, during the deposition, a recess was taken so that defense counsel could review the documents produced; however, those documents did not relate to the calculation of damages.

Sir, we have taken a brief break off the record. You were kind enough to go through and give me quite a few documents. I appreciate that. Just for the record, let me ask you again about the losses we had spoken about. You are going to have to calculate and tabulate the records and come up with a number at some point before the trial. Do you

have any of that documentation here with you today?

No, I do not.

. . . . .

[M]y response to your question was that the sum total of the damages to be calculated would arise from the various elements of conduct and events, which are described in this complaint, and that is the only response that I can give you.

Thomas Deposition, at 63, 66. Nor was Thomas able to provide any documentation of the value of his barony. *Id.*, at 78–80 ("This is just a guess on my part.").

Assuming *arguendo* that the Shelley Defendants breached the contract, the issue is whether the Plaintiffs have forecast evidence of damages sufficient to withstand summary judgment; *i.e.*, have the Plaintiffs "forecast evidence of a genuine issue as to [their] damages." *Dalton v. Camp*, 138 N.C.App. 201, 531 S.E.2d 258, 267 (2000). Plaintiffs argue that summary judgment may not be granted on this issue because it is an issue for jury determination at trial. However, the North Carolina Court of Appeals has held to the contrary.

Despite extensive questioning during his deposition, [Thomas] was unable to establish, or even estimate, damages caused by the alleged breach.... In the absence of evidence of any damage caused by [Defendants'] actions, the trial court properly granted [Defendants'] motion for summary judgment as to this issue.

*Ausley v. Bishop*, 133 N.C.App. 210, 219, 515 S.E.2d 72, 79 (1999). Thus, it is not inappropriate to dispose of the issue at this stage.[6]

■ "The party claiming [the] damages bears the burden of proving its losses with 'reasonable certainty.' That party must show 'that the amount of damages is based upon a standard that will allow the finder of fact to calculate the amount of damages with reasonable certainty.' [T]he reasonable certainty standard requires something more than 'hypothetical or speculative forecasts' ...." *Southern Bldg. Maintenance, Inc. v. Osborne*, 127 N.C.App. 327, 332, 489 S.E.2d 892, 896 (1997) (quoting *Olivetti Corp. v. Ames Business Sys., Inc.*, 319 N.C. 534, 546, 356 S.E.2d 578, 585 (1987)) (other citations omitted); *accord, Leftwich v. Gaines*, 134 N.C.App. 502, 511, 521 S.E.2d 717, 724 (1999).

The measure of damages for breach of[ ] contract is an amount which reasonably may have been contemplated by the parties when they entered into the contract, or which will compensate the injured party as if the contract had been fulfilled. [Damages, including] [l]ost profits may be recovered only when they can be ascertained and measured with reasonable certainty. A party must present evidence, not mere speculation, to recover lost profits. Actual costs are subtracted from the proceeds of a transaction to calculate lost profits. [A] review of the record reveals no evidence from which [Plaintiffs'] lost profits could be determined in the first instance, let alone with reasonable certainty.

*Catoe v. Helms Construction & Concrete Co.*, 91 N.C.App. 492, 495–96, 372 S.E.2d 331, 334 (1988) (internal citations omitted). Applying this standard to Plaintiffs' claims for damages, they allege that the failure to use Shelley's trucks to transport their property breached the contract. However, the contract contained no provision requiring the Defendants to use their own trucks. And, Thomas admitted that the contract "as it stands, was in fact our contract, our written agreement, and our understanding with Shelley's Auction Gallery.... In my opinion, the contract and the agreement, which preceded the contract were typical of the usual and ordinary commercial contract or agreement

---

6. It is also noted that the Court of Appeals did not find summary judgment inappropriate even though breach of contract would normally result in nominal damages. *Ausley, supra.*

considering the mutual purposes of the parties to the contract or the agreement." Thomas Deposition, at 26, 31. Moreover, in the second amended complaint, Plaintiffs allege that Shelley's advised them it was insured for loss. Complaint, at ¶ 11. Nor have the Plaintiffs claimed that they suffered any loss due to the transportation which was not compensated for by such insurance.[7]

 Plaintiffs claim that Ramsey breached the contract by failing to properly view the total extent of their property. However, they also admit that they provided him with photographs of that property. Another allegation of breach involves the lack of adequate personnel to unload and inventory the property and failure to properly inventory and secure the same. However, Plaintiffs have presented no evidence that any of their property was damaged or lost; and, they have presented no evidence that all of their property was not returned to them by Shelley's. No evidence has been presented to show the cost to the Plaintiffs of repacking and moving the property after Shelley's alleged breach of the contract to auction. No evidence has been presented to show the difference between the value Plaintiffs' would have obtained from a Shelley's auction and the amount received by the liquidation. Indeed, Plaintiffs allege that Ramsey was not an appropriate or skilled auctioneer and due to their belief that he would not bring the true value, they requested a different auctioneer. *Id.,* at ¶ 30. And, Plaintiffs admit they liquidated only one-third of their property, which was not the most valuable portion, because they no longer needed the cash. Nor do they have any plans to sell the remainder which is on indefinite loan. As to the allegedly most valuable part of the estate, the barony, Plaintiffs have presented no evidence of its value other than the sale of a different barony which they admit is not comparable.[8]

Plaintiffs have done nothing more than hypothesize and speculate that (1) they have suffered damages, and (2) the value thereof. *McNamara v. Wilmington Mall Realty Corp.* 121 N.C.App. 400, 407, 466 S.E.2d 324, 329 (1996). Having failed to forecast evidence to support their conclusions, it is not inappropriate to grant summary judgment to the Defendants. *Home Indemnity Co. v. Hoechst Celanese Corp.,* 128 N.C.App. 189, 204, 494 S.E.2d 774, 783–84 (1998).

Plaintiffs have admitted that the contract was the sole contract between the parties. They have failed to produce any evidence of damages. Therefore, the only damages to which they are entitled are nominal damages. *Sibley v. Lutheran Hospital of Maryland, Inc.,* 871 F.2d 479, 482 n. 7 (4th Cir.1989); *Catoe,* 91 N.C.App. at 497, 372 S.E.2d at 335 (It was proper to instruct the jury they could not find anything more than nominal damages where there was not evidence upon which a jury could base a damage award.). The undersigned finds that conducting a trial to establish nominal damages would be a waste of judicial resources. *Olsen v. Lake Country, Inc.,* 955 F.2d 203 (4th Cir.1991) (affirming district court's grant of summary judgment and award of nominal damages); *CACI Int'l, Inc. v. Pentagen Technologies Int'l, Ltd.,* 70 F.3d 111 (table), 1995 WL 679952 (4th Cir.1995) (affirming district court's grant of nominal damages in the amount of $1,000 on motion for summary judgment).

## V. ORDER

**IT IS, THEREFORE, ORDERED** that the Defendants' motion for summary judg-

---

7. In the complaint, Plaintiffs allege that one of the movers from Allied Van Lines dropped "[a] box ... and it was apparent that breakage had occurred." Complaint, at 20. However, the mover acknowledged the accident. *Id.* There is no allegation or evidence that any other accident occurred or that the Plaintiffs were not compensated for this incident.

8. Thomas testified that he only had "just a guess" as to its value.

ment is hereby **GRANTED;** a Judgment is filed herewith.

### JUDGMENT

For the reasons set forth in the Memorandum and Order filed herewith,

**IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED** that the Defendants' motion for summary judgment is **ALLOWED,** and this matter is hereby **DISMISSED WITH PREJUDICE,** except,

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that the Plaintiffs have and recover of the Defendants nominal damages in the amount of the reasonable cost of packing and transporting their property from the Defendants' premises. · A final sum may be awarded by the Court after further review. Plaintiffs shall file documentary proof of those damages with this Court on or before fifteen days from entry of this Order. Plaintiffs may not receive such an award if the cost of the same was absorbed by the liquidator which auctioned a portion of the property or by any other entity. In the event that such proof is not filed, Plaintiffs shall have and recover of the Defendants the sum of **ONE DOLLAR ($1.00)** in nominal damages.