Hamm v. Blue Cross & Blue Shield of N.C., 2010 NCBC 14.

STATE OF NORTH CAROLINA

COUNTY OF DURHAM

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
05 CVS 5606

MACY M. HAMM, Individually and on behalf )
of All Others Similarly Situated,                      )
                                        Plaintiff          )
                                                              )
                    v.                                       )
                                                              )
BLUE CROSS AND BLUE SHIELD OF        )
NORTH CAROLINA,                                 )
                                      Defendant          )

**ORDER AND OPINION ON
CROSS MOTIONS
FOR SUMMARY JUDGMENT**

THIS CAUSE, designated exceptional and assigned to the undersigned by Order

of the Chief Justice of the North Carolina Supreme Court, pursuant to Rule 2.1 of the

General Rules of Practice for the Superior and District Courts, came before the court

upon Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's Motion") and

Defendant's Motion for Summary Judgment ("Defendant's Motion") (collectively, the

"Motions"), pursuant to Rule 56, North Carolina Rules of Civil Procedure ("Rule(s)");

and[1]

THE COURT, after considering the arguments, briefs, affidavits, other

submissions of counsel and appropriate matters of record, as discussed *infra*,

CONCLUDES that the Plaintiff's Motion should be GRANTED and the Defendant's

Motion should be GRANTED in part and DENIED in part.

> *Twiggs, Beskind, Strickland & Rabenau, PA by Donald H. Beskind, Esq.; Billet*
> *and Connor, PC by J. Martin Futrell, Esq. and David S. Senoff, Esq.; and*
> *Marcus, Auerbach & Zylstra, LLC by Jerome Marcus, Esq. and Jonathan*
> *Auerback, Esq. for Plaintiff.*

---

[1] In its Answer, Defendant moved to dismiss the Complaint under Rule 12(b)(6). This motion was never
fully briefed and thus is deemed to have been abandoned.

*Brooks, Pierce, McLendon, Humphrey & Leonard, LLP by Jennifer K. Van Zant, Esq. and Charles F. Marshall, III, Esq. for Defendant.*

Jolly, Judge.

I.

PROCEDURAL BACKGROUND

[1]     On November 3, 2005, Plaintiff Macy M. Hamm ("Hamm") filed a Complaint in behalf of herself and all others similarly situated against Defendant Blue Cross and Blue Shield of North Carolina Foundation (the "Foundation") and Defendant Blue Cross and Blue Shield of North Carolina ("BCBSNC").  The Complaint alleges claims for relief ("Claim(s)") in four counts: First Count – Breach of Contract; Second Count – Breach of Good Faith; Third Count – Unfair and Deceptive Trade Practices and Fourth Count – Declaratory Judgment.

[2]     On January 30, 2006, Defendants filed their Answer to the Complaint. The Answer raises ten affirmative defenses, including lack of standing on the part of Plaintiff (Fourth Defense) and failure of Plaintiff to exhaust her available administrative remedies prior to filing this civil action (Fifth Defense).

[3]     On March 21, 2007, the court entered a Consent Order dismissing, without prejudice, the Claims against the Foundation.

[4]     On March 8, 2008, Hamm filed the Plaintiff's Motion, relative to her Claim for declaratory judgment.

[5]     On August 5, 2008, the court granted the Plaintiff's Motion for Class Certification, pursuant to Rule 23.

[6]     On October 10, 2008, BCBSNC filed the Defendant's Motion as to all Claims, on the grounds that (a) the Plaintiff and class members (the "Class") lack

standing to bring their claims and (b) there exist no genuine issues of material fact, and that Defendant is entitled to judgment of dismissal as to all Claims.

[7]     The court has heard oral argument on the Motions and they are ripe for determination.

[8]     Unless otherwise indicated herein, the material facts reflected in paragraphs 9 through 21 of this Order exist, are undisputed[2] and are pertinent to the issues raised by the Motions.

II.

FACTUAL BACKGROUND

[9]     Hamm is a citizen and resident of Wake County, North Carolina.

[10]     The Class includes any individual (a) who ever was a member of one of BCBSNC's preferred provider organization health benefit plans ("PPO Plan(s)" or "Plan(s)") between November 2002, and August 5, 2008, the date of the class certification Order; (b) whose PPO Plan was not an Employee Retirement Income Security Act ("ERISA") plan; (c) who in any benefit period reached their benefit period maximum or who reached their lifetime maximum as those phrases are defined under the terms of their PPO Plan contract and (d) who were charged by in-network providers more than the allowed amount for covered services or supplies after they reached their benefit period maximum or lifetime maximum.

---

[2] It is not proper for a trial court to make findings of fact in determining a motion for summary judgment under Rule 56.  However, it is appropriate for a Rule 56 order to reflect material facts that the court concludes exist and are not disputed, and which support the legal conclusions with regard to summary judgment.  *Hyde Ins. Agency v. Dixie Leasing*, 26 N.C. App. 138, 142 (1975).

[11]     The contract between the Class and BCBSNC consists of a Summary of Benefits, a benefit booklet (the "Booklet"), an application and an optional benefit endorsement (collectively, the "Contract(s)").[3]

[12]     As defined by the Booklet,[4]

(a)     A "member" ("Member") "is a *subscriber* or *dependent*, who is currently enrolled in [a BCBSNC] health benefit plan and for whom premium is paid."[5]  According to the Booklet, "[*M*]*embers* are eligible to receive benefits as long as they are under age 65 at the time they initially enroll, subject to acceptance by *BCBSNC*."[6]

(b)     A "benefit period" is "the 12-month period of time as stated in the 'Summary Of Benefits' during which charges for *covered services* provided to a [M]*ember* must be *incurred* in order to be eligible for payment by *BCBSNC*."[7]

(c)     A "benefit period maximum" is "the dollar amount that each covered [*M*]*ember* can receive in paid benefits from *BCBSNC* for certain services."[8]

(d)     A "lifetime maximum" is "the maximum amount of *covered services* that will be reimbursed for a [M]ember while he or she has coverage under [the] health benefit plan."[9]  It is also defined as the "dollar amount that each covered [*M*]*ember* can receive in paid benefits from *BCBSNC* during a lifetime for certain services."[10]

---

[3] Dunlap Aff., Ex. A BCBS003026 (hereinafter, references to this source will be to Ex. A 30**).
[4] The court includes BCBSNC's use of italics in the following definitions to identify other defined terms.
[5] Dunlap Aff., Ex. A 3071.
[6] *Id.* at 3054.
[7] *Id.* at 3068.
[8] *Id.* at 3038.
[9] *Id.* at 3071.
[10] *Id.* at 3038.

(e)     An "in-network provider" is "a *hospital*, *doctor*, other medical practitioner or *provider* of *medical services* and supplies that has been designated as a Blue Advantage *provider* by *BCBSNC*.[11]   It is also defined as one who participates in the Blue Advantage network.[12]

(f)     An "allowed amount" is "the charge that *BCBSNC* determines is reasonable for *covered services* provided to a *[M]ember*."[13]

(g)     A "covered service" as "a service, drug, supply or equipment specified in this benefit booklet for which *[M]embers* are entitled to benefits in accordance with the terms and conditions of this health benefit plan."[14]

[13]     BCBSNC operates as a non-profit "medical services corporation" under N.C. Gen. Stat. Ch. 58 (hereinafter, references to the North Carolina General Statutes will be to "G.S.").

[14]     BCBSNC has Members enrolled in PPO Plans, including but not limited to plans with trade names Blue Advantage and Blue Options and plans governed by the provisions of ERISA.

[15]     BCBSNC contracts with health care providers to provide certain covered services to Members who are enrolled in Blue Advantage.

[16]     BCBSNC contracts with certain entities to offer group health plans.

[17]     Hamm purchased Blue Advantage health insurance from BCBSNC in or around 2003.  Hamm renewed her Blue Advantage policy each year through the filing of

---

[11] *Id.* at 3070.
[12] *Id.* at 3017.
[13] *Id.* at 3068.
[14] *Id.* at 3068.

her Complaint and has remained a Member of the plan at least until the date of the filing of this action.

[18]     On or about June 12, 2003, Hamm gave birth to a son.  This son was a Member of Hamm's Blue Advantage plan as of the date of the filing of this action.

[19]     From June 12, 2003, through the date of filing, Hamm's son received extensive medical treatment from in-network providers for cerebral palsy, including extensive physical and speech therapies.  He reached the benefit period maximums under Hamm's PPO plan prior to the close of the benefit period.

[20]     Subsequent to reaching the benefit period maximums, Hamm's son continued to receive therapies from in-network providers although Hamm was responsible for payment for the therapies.  The in-network providers charged Hamm their ordinary rates, which exceeded the allowed rates for those services that her son received from in-network providers before he reached benefit period maximums.

[21]     Similarly, after the Class Members' benefit period maximums were reached, the in-network providers charged Class Members the providers' ordinary rates, amounts which exceeded the allowed rates for those services Class Members received from in-network providers before they reached benefit period maximums.

III.

PARTIES' CONTENTIONS

[22]     The pivotal issue before the court is one of contractual construction of the Booklet.  More specifically, it is whether as a matter of law (a) as Defendant contends, BCBSNC can adjudicate claims from in-network providers to allow them to charge PPO Class Members amounts over the allowed amount once the Member reaches a benefit

period maximum for covered services when the maximum is expressed in visits rather than dollars; or (b) as Plaintiff contends, BCBSNC is contractually bound to a promise to Class Members that if a Member received covered services from an in-network provider, the Member would never be responsible for any amount of excess of the discounted contract rate BCBSNC has negotiated with the in-network provider.

[23]    The Plaintiff argues that (a) BCBSNC's exclusion of covered services as such upon a Member's reaching a benefit period maximum expressed in visits determines and limits BCBSNC's responsibility only as to the level of payments by a Member, and does not act to establish whether a service is a covered service for other purposes under the Contract, (b) the Contract expressly limits a Member's responsibility for payment to the allowed amount unless services are provided by out-of-network providers and (c) at best, the Contract language is ambiguous as a matter of law and must be construed against BCBSNC.

[24]    BCBSNC argues that (a) Class Members lack standing to bring the action against BCBSNC because (i) they fail to allege a sufficient injury in fact; (ii) their alleged injury is not fairly traceable to the acts of BCBSNC and (iii) their alleged injuries cannot be redressed by a favorable decision against BCBSNC; (b) Class Members failed to exhaust their administrative remedies and cannot proceed here and (c) the substantive Claims of the Complaint fail as a matter of law pursuant to Rule 56.[15]

---

[15] The various other affirmative defenses raised by Defendant are not pivotal to the court's determination of the Motions and need not be analyzed in this Order.

IV.

## APPLICABLE LAW

[25] Under Rule 56(c), summary judgment is to be rendered "forthwith" if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that upon the forecast of evidence there exists no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law. *Grayson v. High Point Dev. Ltd. P'ship*, 175 N.C. App. 786, 788 (2006). The court views the evidence in the light most favorable to the nonmoving party. *Bruce-Terminix Co. v. Zurich Ins. Co.*, 130 N.C. App. 729, 733 (1998).

V.

## ANALYSIS

[26] The court first will consider Defendant's threshold procedural defenses with regard to the issues of standing and exhaustion of administrative remedies.

A.

## STANDING

[27] A party must have standing to assert a claim in order to invoke the subject matter jurisdiction of this court. *See Estate of Apple v. Commercial Courier Express, Inc.,* 168 N.C. App. 175, 177, *disc. rev. denied,* 359 N.C. 632 (2005). The question of standing is jurisdictional and may be raised at any time. *Crouse v. Mineo*, 189 N.C. App. 232, 236 (2008).

[28] Standing requires (a) injury in fact, which is an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (b) that the injury be fairly traceable to the challenged action

of the defendant and (c) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *See Neuse River Found., Inc. v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 114 (2002).

a.

Injury in Fact

[29]    A breach of contract, even if negligible, constitutes injury.[16]  Here, the Class Members have alleged and forecast evidence sufficient to establish such a breach.  Therefore, nothing else appearing, they satisfy this standing element.

[30]    However, North Carolina courts have held that a claim which is "barred by law," *e.g.*, because of expiration of the applicable statute of limitations, does not satisfy the injury in fact standing requirement.  *Estate of Apple*, 168 N.C. App. at 177.  Here, BCBSNC argues that the statute of limitations has expired on some Class Claims and that those Class Members do not have standing in this civil action.

[31]    A claim for an alleged injury must be made within the applicable statue of limitations.  The statute of limitations for contracts is three years from the time of accrual.  G.S. 1-52(1).  Accrual takes place "as soon as the right to institute and maintain a suit arises."  *Penley v. Penley*, 314 N.C. 1, 19-20 (1985).

[32]    The Complaint in this action defines BCBSNC's alleged breach of contract as the act, committed by both BCBSNC and in-network providers, of charging Class Members amounts in excess of the allowed amount for medical services provided by the in-network providers after they reach the benefit period maximum and/or lifetime

---

[16] *See Bowen v. Bank*, 209 N.C. 140, 144 (1936); *Kinnard v. Mecklenburg Fair*, 46 N.C. App. 725, 730 (1980) (holding that once breach of contract is established, plaintiff is entitled to at least nominal damages because of injury to rights).  *See also Neuse River Found.,* 155 N.C. App. at 114..

maximum.[17] The breach is later described as BCBSNC's alleged improper adjudication of the Class Members' claims.[18] A cause of action for such a contended breach of contract would accrue when an in-network provider charged its ordinary rates to the Class Member.

[33] Consequently, the statute of limitations would bar contract Claims against BCBSNC by those Class Members who were charged ordinary rates by in-network providers more than three years prior to the commencement of this action. However, it would not bar contract Claims by those Class Members who were charged ordinary rates by in-network providers less than three years prior to the commencement of this action, or whose particular fact situation would cause a tolling of the statute of limitations. C*oe v. Highland Sch. Assocs. Ltd. P'ship*, 125 N.C. App. 155, 157 (1997), *Johnson Neurological Clinic, Inc. v. Kirkman*, 121 N.C. App. 326, 330-31 (1996).

b.

Fairly Traceable

[34] For an injury to be fairly traceable to the challenged action of the defendant, it must not be the result of the independent action of a third party not before the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). *See also Frank Krasner Enters. v. Montgomery County*, 401 F.3d 230, 235 (4th Cir. Md. 2005); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 162 (4th Cir. S.C. 2000).

---

[17] Compl. ¶ 24.
[18] Pl. Mem. Opp. Def. Mot. Summ. J. ¶ III (C).

[35]     In the case *sub judice*, the alleged breach of contract is itself the cause of the injury. Therefore, the acts of independent third parties are of no moment,[19] and Class Members satisfy this element.

c.

Redressability Requirement

[36]     For an injury to be redressable, a favorable decision must not depend "on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict."  *Wangberger v. Janus Capital Group (In re Mut. Funds Inv. Litig.)*, 529 F.3d 207, 217 (4th Cir. Md. 2008), citing *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 615 (1989).

[37]     In the case *sub judice*, a decision favorable to Class Members would remedy their injuries by estopping Defendant from breaching its alleged contracts with them, *i.e.*, from continuing to allow in-network providers to charge standard rates to Class Members once Class Members have exceeded visit maximums, and by obliging Defendant to pay compensatory damages.

[38]     The court concludes that Plaintiff and Class Members have standing, and Defendant's Motion based on lack of standing should be DENIED.

B.

EXHAUSTION OF ADMINISTRATIVE REMEDIES

[39]     The court next considers BCBSNC's exhaustion of remedies argument.

---

[19] Defendant's argument that it is the provider's decision actually to charge and collect rates in excess of the allowed amount, Werner Aff. ¶ 11, is attractive, though unconvincing.  It is to be expected that a provider, if given a choice, would charge the higher rate.

[40]    Courts will enforce parties' contractual agreements to submit disputes to administrative resolution before litigating an action.  *See, e.g., Adams v. Nelsen,* 313 N.C. 442, 446 (1985); *Summerville v. Local 77*, 369 F. Supp. 2d 648, 657 (M.D.N.C. 2005); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. N.Y. 1994).  *See also Brooks v. Arlington Hosp.*, 850 F.2d 191, 196 (1988).

[41]    At first blush, the grievance process at issue here seems to be completely voluntary in nature.[20]  However, the Limitation on Actions provision of the Booklet makes it clear that a Member may not take action to recover benefits for sixty (60) days after the Member gives BCBSNC a Notice of Claim and until the Member has exhausted all administrative remedies, including the grievance process.[21]

[42]    However, neither the particular provision nor the contract defines an "action to recover benefits."  Moreover, neither equates the phrase "action to recover benefits" with the term "grievance."  Without more, the court must look to the plain meaning of the words used.  In doing so, the court is forced to conclude that an action to recover benefits is not necessarily the same as an action regarding billing or claims processing.  As such, the phrase is ambiguous, and the court must view it in light of the Class Members' reasonable interpretation to the effect that they were not subject to the provision because they were not complaining about a denial of benefits, but rather about billing and claims processing.[22]

[43]    The court concludes that Defendant's Motion based upon failure to exhaust administrative remedies should be DENIED.

---

[20] Ex. A 3059 ("The grievance process is voluntary . . . .").
[21] *Id.* at 3066.
[22] *See* Def. Mot. Summ. J., Ex. 4 (Hamm Dep.) 167: 20-25.

C.

FOURTH COUNT – DECLARATORY JUDGMENT

[44] The court now considers the Motions with respect to the Class Members' action for declaratory judgment.[23] As to this Count, both Plaintiff and Defendant seek judgment pursuant to Rule 56.

1.

Background

[45] Class Members seek a declaration by the court that they are not responsible for payment of any amount above the "allowed amount," as the term is defined by the Contracts, for services that they receive from in-network providers,[24] including those situations in which they have reached their benefit period maximums and/or lifetime maximums under their PPO Plans.

[46] By way of their Motion, Class Members ask the court to conclude as a matter of law that under the relevant Contracts, BCBSNC cannot adjudicate claims from in-network providers to allow those providers to charge Class Members at rates over the allowed amount once Class Members reach a benefit period maximum for covered services when the maximum is expressed in visits rather than dollars. The Class Members construe their Contracts with BCBSNC to include an express promise by BCBSNC that Members who receive covered services from in-network providers will never be responsible for any payment amount in excess of an allowed amount. The Class Members distinguish the terms "exclusion" and "limitation," arguing that covered

---

[23] The court determines it is preferable to consider the Plaintiff's Fourth Count first.

[24] Regardless of whether Class Members or BCBSNC are responsible for payment to the in-network provider.

services are subject to limitations, but not exclusions and, as such, always remain covered services.

[47]    On the other hand, BCBSNC contends that a fair reading of the Contracts supports its argument that the term "covered services" does not include those services provided by in-network providers that exceed a visit benefit period maximum.  BCBSNC points out that the Class Members' contended construction effectively would prohibit in-network providers from charging Members even the allowed amount because in-network providers are not allowed to charge Members any fees for covered services other than deductibles, coinsurance and copayments.[25]  BCBSNC also argues that if a service remained a covered service after a Member exceeded a visit maximum, then BCBSNC would be required to pay benefits for those services indefinitely, thus rendering ineffective the visit limitation.

[48]    As discussed *supra*, a "covered service" is "a service, drug, supply or equipment specified in this [] Booklet for which *Members* are entitled to benefits in accordance with the terms and conditions of this health benefit plan."[26]

[49]    The central issue for resolution is whether the "terms and conditions" referred to in the Contract's definition of "covered services" includes restrictions on benefits provided after a Member has exceeded an applicable benefit period maximum and/or lifetime maximum.

[50]    The Contract documents do not define explicitly the applicable "terms and conditions" and, as such, the court must look to the other Contract provisions to

---

[25] Werner Aff. ¶ 7, Ex. B ¶ 10.13.2.
[26] Ex. A 3068.

determine the meaning of those words. *See Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co.*, 276 N.C. 348, 355 (1970), *supra*.

2.

Applicable Law

[51]    The meaning of language in an insurance policy is a matter of law. *Wachovia*, 276 N.C. at 354.

[52]    If a term is defined in a policy, that definition is given to the term wherever it appears in the policy, unless the context clearly requires otherwise. *Id.  See also Woods v. Nationwide Mut. Ins. Co.*, 295 N.C. 500, 505-06 (1978); *Nationwide Mut. Ins. Co. v. Mabe*, 342 N.C. 482, 492 (1996) ("If a policy defines a term, then that meaning is to be applied regardless of whether a broader or narrower meaning is customarily given to the term, the parties being free, apart from statutory limitations, to make their contract for themselves and to give words therein the meaning they see fit.") (internal citation omitted).

[53]    If a term is not defined in a policy, "nontechnical words are to be given a meaning consistent with the sense in which they are used in ordinary speech, unless the context clearly requires otherwise." *Wachovia*, 276 N.C. at 354.  *See also Woods*, 295 N.C. at 506 (1978); *North Carolina Farm Bureau Mut. Ins. Co. v. Mizell*, 138 N.C. App. 530, 532-33 (2000).

[54]    If the immediate context in which a word is used in a policy does not clearly indicate the intended meaning of a word, a court may look to other portions of the policy and construe all its clauses to bring them into harmony. *Wachovia*, 276 at 355.  *See also Woods*, 295 N.C. at 506 (1978); *Pa. Nat'l Mut. Ins. Co. v. Strickland*, 178

N.C. App. 547, 550 (2006) ("[E]ach provision of an insurance contract must be interpreted in view of the whole contract and not in isolation.").  Moreover, "[e]ach word is deemed to have been put into the policy for a purpose and will be given effect, if that can be done by any reasonable construction in accordance with the foregoing principles."  *Id.* (referencing *Williams v. Ins. Co.,* 269 N.C. 235, 240 (1967)).

[55]     An ambiguity exists when, in the court's opinion, "the language of the policy is fairly and reasonably susceptible to either of the constructions for which the parties contend."  *Wachovia*, 276 N.C. at 354 (internal citation omitted).  *See also Joyner v. Nationwide Ins.*, 46 N.C. App. 807, 809, *disc. rev. denied*, 301 N.C. 91 (1980) ("The test in deciding whether the language is plain or ambiguous is what a reasonable person in the position of the insured would have understood it to mean, and not what the insurer intended.");  *Strother v. N.C. Farm Bureau Mut. Ins. Co.*, 90 N.C. App. 734, 737 (1988) ("The determinative question is whether a reasonable person in the position of the insured, from reading the policy, would believe the policy provided coverage.").

[56]     Any ambiguity or uncertainty as to the meaning of words in an insurance policy is resolved in favor of the policyholder, or the beneficiary, and against the company because the company drafted the policy.  *Wachovia*, 276 N.C. at 354.  *See also Woods*, 295 N.C. at 506 (1978).

[57]     Exclusions upon and limitations of "undertakings by the [insurance] company, otherwise contained in the policy, are to be construed strictly so as to provide the coverage, which would otherwise be afforded by the policy."  *Wachovia*, 276 N.C. 348 at 355).  *See also Southeast Airmotive Corp. v. United States Fire Ins. Co.*, 78 N.C. App. 418, 420 (1985), *disc. review denied*, 316 N.C. 196 (1986) ("Exclusions from

liability are not favored, and are to be strictly construed against the insurer. (citation omitted). When the coverage provisions of a policy include a particular activity, but that activity is later excluded, the policy is ambiguous, and the apparent conflict between coverage and exclusion must be resolved in favor of the insured."); *Washington Hous. Auth. v. North Carolina Hous. Auths. Risk Retention Pool*, 130 N.C. App. 279, 281 (1998), *disc. review denied*, 349 N.C. 530 (1998) ("In construing the provisions of an insurance policy . . . wherever possible, the policy will be interpreted in a manner 'which gives, but never takes away, coverage.'") (internal citation omitted).

3.

Other Contract Terms and Conditions

[58]     The court now looks to other parts of the Contract policy to determine what "terms and conditions" apply to covered services.

[59]     The "Covered Services" section of the Booklet lists a number of covered services.[27]  This section also indicates that exclusions and limitations apply to a Member's coverage.[28]  First, the section refers to service-specific exclusions.[29]  For example, benefits for short-term rehabilitative therapies are limited to a combined in-network and out-of-network benefit period maximum.[30]  Second, the section refers to exclusions that apply to many services.[31]  Third, the section directs the Member to other sections to understand what exclusions and limitations apply to each service.[32]

---

[27] Dunlap Aff. Ex. A. 3039-52.
[28] *Id.* at 3039.
[29] *Id.*
[30] *Id.* at 3044.
[31] *Id.* at 3039.
[32] *Id.*

[60]     The preceding descriptions of exclusions and limitations refer only to specific services or groups of services, not services as a whole.  If there were such exclusions or limitations, the Covered Services section does not indicate where an explanation of such would be located.  Moreover, the exclusions described in the "What is Not Covered?" section of the Booklet are service-specific.[33]  None of these exclusions indicate that coverage ends for services, supplies, drugs or charges not listed when visit or dollar maximums are exceeded.[34]  As such, it is reasonable to interpret these sections as suggesting that no exclusions or limitations apply to all services.

[61]     Defendant's interpretation of "covered services" is inconsistent with the above interpretation because it suggests an exclusion that would apply to all services.

[62]     The Booklet starkly contrasts in and out-of-network benefits.[35]  Its description of out-of-network benefits specifically states that if a Member receives covered services from an out-of-network provider, that Member may be required to pay the difference between the provider's actual charge and the BCBSNC allowed amount.[36]  There is no such limitation in the description of in-network benefits.[37]  Rather, in the "Understanding Your Share of the Cost" section, the Booklet instructs Members that if they receive covered services from in-network providers, then they are not responsible for any charge over the allowed amount.  There is no limitation on this statement.

---

[33] *Id.* at 3052.
[34] *Id.* at 3052-53.
[35] *See, e.g., id.* at 3039.
[36] *Id.* at 3035.
[37] *See id.* at 3034.

[63] The "When Coverage Begins and Ends" section explains that Members are eligible to receive benefits subject to an age restriction.[38] Termination of a Member's coverage is predicted only when the Member reaches his or her lifetime maximum, not a benefit period maximum.[39] As such, it is reasonable to construe the language to mean that coverage continues despite visits to in-network providers that exceed a benefit maximum.

[64] Moreover, the "Additional Terms Of Your Coverage" section explains that benefits for services provided by in-network providers are "based on the lesser of the *allowed amount* or the *provider's* charge."[40] The section reminds Members, however, that Members are responsible for charges not covered by Blue Advantage, such as amounts above the benefit maximums, and for the full cost of noncovered services.[41] In contrast, the same section explains that benefits for services provided by out-of-network providers are paid based on the allowed amount and that, in addition to the limitations listed above, the Members are responsible for any amounts over the allowed amount.[42]

[65] The court has attempted to construe the Contract documents in the manner contended by Defendant in its Motion. The court has been unable to give the Contract only the construction argued by Defendant. Rather, the court is forced to conclude that the Contract documents' description of terms and conditions imposed upon covered services is fairly and reasonably susceptible to either of the constructions for which the respective parties have argued. As such, an ambiguity exists, and the court is required to resolve the ambiguity in favor of the Class.

---

[38] *Id.* at 3055.
[39] *Id.*
[40] *Id.* at 3063.
[41] *Id.*
[42] *Id.* at 3063-64.

[66]     Accordingly, the court concludes that the terms and conditions that limit the definition of "covered service" do not include restrictions placed on benefits provided by in-network providers after a Member has exceeded an applicable benefit period maximum and/or lifetime maximum.

[67]     Accordingly, with regard to Plaintiff's Fourth Count, the court CONCLUDES that there exist no genuine issues of material fact, that Plaintiff's Motion as to said Fourth Count should be GRANTED and that Defendant's Motion should be DENIED.

D.

<u>FIRST COUNT – BREACH OF CONTRACT</u>

[68]     Defendant's Motion seeks dismissal of Plaintiff's breach of contract Claim.

[69]     The Complaint alleges that BCBSNC breached its Contract with Class Members by charging them an amount in excess of the allowed amount for medical services rendered by in-network providers after reaching applicable benefit period maximums.  BCBSNC responds correctly that it was the providers, not BCBSNC, who charged the Class Members.  The Complaint later defines the breach complained of as the wrongful adjudication of claims processing.  At the heart of both definitions is the contention that BCBSNC broke its alleged promise to Class Members that they would not be charged more than an allowed amount if they received covered services from in-network providers.[43]

[70]     To determine whether or not there is evidence sufficient to support a Claim that BCBSNC broke such a promise, the court considers the process by which Class Members are charged more than the allowed amount for covered services.

---

[43] *Id.* at  3037.

[71]     After receiving requests for reimbursement from in-network providers, BCBSNC's procedure is to determine whether the services are covered.[44]  BCBSNC then provides the in-network provider with either a "Notification of Payment" or an "Explanation of Payment."[45]  These documents inform a provider whether and to what extent it will be reimbursed for the services it provided to the Member.[46]

[72]     The provider will not be reimbursed by BCBSNC for non-covered services.[47]  An example of a non-covered service, as defined by BCBSNC, is a visit exceeding the Member's visit maximum.[48]  BCBSNC contends that the provider may seek payment in excess of the allowed amount from Members for such non-covered services.[49]  The right to seek such payment may require the provider to obtain the Member's written authorization prior to rendering the non-covered services.[50]  The provider may bill a Member for those amounts reflected in the Notification of Payment as owed by the Member.[51]

[73]     As the court has concluded, *supra*, covered services remain covered notwithstanding an exhausted benefit or lifetime maximum.

[74]     As such, BCBSNC's labeling of a covered service as one that is not covered may lead causally to Members being charged more than the allowed amount

---

[44] Dunlap Aff. ¶ 8.

[45] *Id.* ¶¶ 12-13.

[46] These documents reflect the provider's billed charges, the allowed amount and the Member's liability. *Id.*

[47] *Id.* ¶ 8.  However, "BCBSNC may, in its discretion, process claims that exceed a benefit maximum at the provider's full charge rather than at the discounted or contracted rate known as the 'allowed amount.' BCBSNC, however, may choose to continue to process the claim at an allowed amount."  Kreidt Aff. ¶ 4. Plaintiff contends that this use of discretion is itself a breach of BCBSNC's Contract with the Class.

[48] Dunlap Aff. ¶ 30.

[49] *Id.* ¶ 10.  *See also* Werner Aff., Ex. A ¶ 4.7.

[50] *See* Werner Aff. Ex. A  ¶¶ 4.7.6, 4.7.7.

[51] *Id.* ¶ 4.7.3.  The provider also may bill the Member if, prior to receipt of the notification, BCBSNC verified that the services received were not covered.  *Id.*

for covered services. Therefore, such labeling may constitute a breach of BCBSNC's contract with its Members.

[75]     The court concludes that Plaintiff has forecast evidence sufficient to support the allegations of a breach of the Contract and that the Class Members have suffered damages and the value thereof. *See, e.g., Shalford v. Shelley's Jewelry, Inc.*, 127 F. Supp. 2d 779, 789 (W.D.N.C. 2000). *See also* <u>Standing</u>, *supra*.

[76]     Accordingly, with regard to Plaintiff's First Count, the court CONCLUDES that there exist one or more genuine issues of material fact, and that BCBSNC's Motion as to said First Count should be DENIED.

E.

<u>SECOND COUNT – BREACH OF GOOD FAITH</u>

[77]     Defendant's Motion seeks dismissal of Plaintiff's Claim for breach of the covenant of good faith.

[78]     "In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Sunset Beach Dev., LLC v. Amec, Inc.,* 2009 N.C. App. LEXIS 454 **29-30 (N.C. Ct. App. 2009) (citing *Bicycle Transit Auth., Inc. v. Bell,* 314 N.C. 219, 228 (1985)).

[79]     While an action for breach of covenant of good faith is "part and parcel" of a claim for breach of contract, *Shalford*, 127 F. Supp. 2d at 787, a breach of a contract does not, by itself, breach this implied covenant.

[80]     Instead, a claim for breach of covenant of good faith suggests a party did not act upon the principles of good faith or fair dealing to accomplish the purpose of an

agreement. *Maglione v. Aegis Family Health Ctrs.*, 168 N.C. App. 49, 56 (2005). It requires the wrongful intent of a party to deprive another party of its contractual rights. *See*, e.g., *Dull v. Mutual of Omaha Ins. Co.*, 85 N.C. App. 310, 318 (1987).

[81]    In the case *sub judice*, the court concludes that the forecast evidence is not sufficient to create a genuine issue of fact as to BCBSNC's breach of a covenant of good faith. *Id.* The record discloses no evidence that BCBSNC acted with the intent to wrongfully deprive Class Members of the benefits to which they were entitled.

[82]    Accordingly, with regard to Plaintiff's Second Count, the court CONCLUDES that there exist no genuine issues of material fact, and that BCBSNC's Motion as to said Second Count should be GRANTED.

F.

THIRD COUNT – UNFAIR AND DECEPTIVE TRADE PRACTICES

[83]    Defendant's Motion seeks dismissal of Plaintiff's Claim for unfair and deceptive trade practices.

[84]    Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are unlawful. G.S. 75-1.1(a). To establish a violation of G.S. 75-1.1, a party must show (a) an unfair or deceptive act or practice, or an unfair method of competition, (b) in or affecting commerce and (c) proximately causing actual injury to the party. *Sunbelt Rentals, Inc. v. Head & Engquist Equip., LLC*, 2002 NCBC 4, ¶ 67 (N.C. Super. Ct. 2002).

[85]    A trade practice is unfair when "it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Marshall v. Miller*, 302 N.C. 539, 548 (1981). Conduct by an

insurance company that manifests "an inequitable assertion of power or position" also constitutes an unfair trade practice. *Murray v. Nationwide Mut. Ins. Co.*, 123 N.C. App. 1, 9 (1996).

[86]    A trade practice is deceptive if it "has the capacity or tendency to deceive." *Johnson v. Phoenix Mut. Life. Ins. Co.*, 300 N.C. 247, 266 (1980), *overruled in part on other grounds*, *Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 569 (1988). To prevail on a UDTP claim, plaintiffs must demonstrate that the act "possessed the tendency or capacity to mislead, or created the likelihood of deception." *Overstreet v. Brookland, Inc.*, 52 N.C. App. 444, 453 (1981).

[87]    An unfair or deceptive trade practice claim against an insurance company can be based on violations of either G.S. 75-1.1 or G.S. 58-63-15. Here, Plaintiff bases her Third Count upon G.S. 58-63-15, a violation of which has been held to constitute a violation of G.S. 75-1.1. *Country Club of Johnston County, Inc. v. United States Fid. & Guar. Co.*, 150 N.C. App. 231, 244 (2002). *Pearce v. Am. Defender Life Ins. Co.*, 316 N.C. 461, 470 (1986); *Miller v. Nationwide Mut. Ins. Co.*, 112 N.C. App. 295, 302 (1993), cert. denied, 335 N.C. 770 (1994); *Murray v. Nationwide Mut. Ins. Co.*, 123 N.C. App. 1, 10 (1996).

[88]    Courts may look to the types of conduct prohibited by G.S. 58-63-15 for examples of conduct that would constitute an unfair and deceptive act or practice. *Country Club of Johnston County,* 150 N.C. App. at 246 (specifically discussing G.S. 58-63-15(11)). The "[m]aking, issuing, circulating, or causing to be made, issued or circulated, any estimate, illustration, circular or statement misrepresenting the terms of

any policy issued . . . or the benefits or advantages promised thereby . . . " is one such prohibited act.  G.S. 58-63-15(1).

[89]    To support a Chapter 75 claim based on violation of G.S. 58-63-15, a plaintiff must demonstrate that the defendant's representation had the capacity or tendency to deceive.  *Pearce*, 316 N.C. at 470-71.  Proof of actual deception, however, is not necessary.  *Id.* at 471.  A truthful statement "may be deceptive if it has the capacity or tendency to deceive.  (citation omitted).  'In determining whether a representation is deceptive, its effect on the average consumer is considered.'"  *Id.* (citing *Johnson,* 300 N.C. at 265-66).  A plaintiff must also show that it suffered actual injury as a proximate result of defendant's deceptive statement or misrepresentation.  *Id.*  (citing *Ellis v. Smith-Broadhurst, Inc.*, 48 N.C. App. 180, 184 (1980)).

[90]    A breach of contract action is distinct from an action for unfair or deceptive trade practices.  *Boyd v. Drum*, 129 N.C. App. 586, 593 (1998).  Indeed, an intentional breach "is not sufficiently unfair or deceptive to sustain an action under N.C.G.S. § 75.1.1."  *Branch Banking and Trust Co. v. Thompson*, 107 N.C. App. 53, 62, *disc. review denied*, 332 N.C. 482 (1992).  Rather, substantial aggravating circumstances attendant to the breach must be shown to sustain such an action.  *Id.  See also Griffith v. Glen Wood Co.*, 184 N.C. App. 206, 217-18 (2007).  However, neither good faith nor lack of intent is a defense to an action for unfair and deceptive trade practices.  *Murray*, 123 N.C. App. at 10.

[91]    "The business of insurance is unquestionably 'in commerce' insofar as an 'exchange of value' occurs when a consumer purchases an insurance policy . . . ."  *Pearce*, 316 N.C. at 469.

[92]     Neither the statutory language of G.S. 58-63-15(1) nor that of G.S. 75-1.1 require actual reliance to show causation. *Cullen v. Valley Forge Life Ins. Co.*, 161 N.C. App. 570, 580 (2003). Whether there is a causal relation between the violation of the statute and the injury complained of is an issue of fact for a jury. *Ellis,* 48 N.C. App. at 184 (citing *Lewis v. Archbell*, 199 N.C. 205, 206 (1930)); *Mayton v. Hiatt's Used Cars*, 45 N.C. App. 206, 211 (1980).

[93]     Plaintiff alleges that BCBSNC violated G.S. 58-63-15 by issuing statements through the Booklet and promotional materials for PPO Plans that PPO Members would not be responsible for payment of medical services provided by an in-network provider for any amount charged above the allowed amount.

[94]     BCBSNC responds that (a) its policies and promotional materials do not state that services in excess of a benefit maximum are covered services or that Members are entitled only to pay the allowed amount for services in excess of a benefit maximum; (b) the allegation that BCBSNC's promotional materials state that Members are not responsible to pay in-network providers more than the allowed amount only applies to covered services and (c) as such, whether services in excess of a benefit maximum are covered services under the terms of the policies is a question of contract interpretation.

[95]     That contract language can be interpreted differently does not prove the language has the capacity or tendency to deceive. Indeed, a court must differentiate "between contract and deceptive trade practice claims, and relegate claims regarding the existence of an agreement, the terms contained in an agreement, and the interpretation of an agreement to the arena of contract law." *N.C. Mut. Life Ins. Co. v.*

*McKinley Fin. Servs.*, 2005 U.S. Dist. LEXIS 36308 *34 (M.D.N.C. Dec. 22, 2005) (citing *Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 347 (4th Cir. 1998) (holding that given the contractual center of that dispute, plaintiffs' Chapter 75-1.1 claims were out of place)). The arguments between the parties regarding the meaning of the statements at issue suggest the crux of this case lies in contract interpretation, not misleading statements constituting an unfair or deceptive trade practice.

[96]     Plaintiff also argues that BCBSNC's contracts with in-network providers are unfair, oppressive to PPO Members and injurious to PPO Members in violation of G.S. 75-1.1. Hamm does not, however, allege facts that, if proven, would suggest such contracts offend established public policy, are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers or manifest an inequitable assertion of power or position by BCBSNC.

[97]     Plaintiff further argues that BCBSNC's PPO Plans and the terms of these plans have the tendency and capacity to deceive and are in and affecting commerce in violation of G.S. 75-1.1 because BCBSNC allows in-network providers to charge amounts above the allowed amount to PPO Members when those Members reach their benefit period maximums and/or lifetime maximums for medical services provided by the in-network providers. Plaintiff has not, however, alleged facts that, if proven, would suggest the PPO Plans and the terms thereof offend established public policy, are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers or manifest an inequitable assertion of power or position by BCBSNC. Moreover, Plaintiff has not alleged or forecast evidence that Class Members detrimentally relied upon any of the claims adjudication documents at issue, *e.g.*, Explanation of Benefits forms.

Rather, the record reflects that Hamm actually had inquired and received advance notice from BCBSNC that the claim would not be adjudicated at the allowed amount.[52]

[98]    In contrast to the Complaint, Class Members later argue the misrepresentation at issue is BCBSNC's representation to plan Members and in-network providers that covered services are noncovered services, directly tying this representation to what Class Members define as a breach of contract.[53]

[99]    As discussed *supra*, a breach of contract does not by itself establish an unfair or deceptive trade practice.  Plaintiff has not forecast evidence supporting a finding that the PPO Plans or the actions of BCBSNC were "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers" for purposes of establishing a Chapter 75 claim, or other facts that manifest an inequitable assertion of power or position by BCBSNC.

[100]    Accordingly, with regard to Plaintiff's Third Count, the court CONCLUDES that there exist no genuine issues of material fact, and that BCBSNC's Motion as to said Third Count should be GRANTED.

NOW THEREFORE, based upon the foregoing CONCLUSIONS, it hereby is ORDERED that:

[101]    Plaintiff's Motion for Partial Summary Judgment as to the Fourth Count – Declaratory Judgment is GRANTED; and it is DECLARED that Class Members are not responsible for payment of any amount above the "allowed amount," as the term is defined by the Contracts, for services that they receive from in-network providers,

---

[52] Def. Opp. Pl. Mot. Class Cert., Ex. 1 (Hamm Dep. at 72-73).
[53] Pl. Mem. Opp. 16.

including those situations in which they have reached their benefit period maximums and/or lifetime maximums under their PPO Plans.

[102] EXCEPTED from the Class shall be those putative Members whose Claims are determined to have accrued more than three years prior to the commencement of this civil action.

[103] Defendant's Motion for Summary Judgment as to the First Count – Breach of Contract is DENIED.

[104] Defendant's Motion for Summary Judgment as to the Second Count – Breach of Good Faith is GRANTED, and said Second Count is DISMISSED.

[105] Defendant's Motion for Summary Judgment as to the Third Count – Unfair and Deceptive Trade Practices is GRANTED, and said Third Count is DISMISSED.

[106] The court CONCLUDES, pursuant to the provisions of Rule 54(b), that there is no just reason for delay in the entry of this Order, and that the Order constitutes a final judgment as to one or more, but fewer than all, of the Claims raised in this civil action.

SO ORDERED, this the 27th day of August, 2010.