Koch Measurement Devices, Inc. v. Armke, 2015 NCBC 42.

STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
12 CVS 3478

KOCH MEASUREMENT DEVICES, INC.,
                Plaintiff

v.

ANGELA LEE ARMKE, AS THE
EXECUTRIX OF THE ESTATE OF
KENNETH W. ARMKE, II; TOTE GLASS,
INC. and DENNIS M. WALSAK d/b/a
MODULAR GRAPHICS & MEDIA, a sole
proprietorship,
                Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)

**OPINION AND ORDER ON MOTIONS
FOR SUMMARY JUDGMENT**

THIS MATTER comes before the Court upon Plaintiff Koch Measurement Devices, Inc.'s Motion for Partial Summary Judgment ("Plaintiff's Motion"), and Defendant Tote Glass, Inc. and Defendant Dennis M. Walsak, d/b/a Modular Graphics & Media's Motion for Summary Judgment ("Defendants' Motion") (collectively, "Motions"), pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("Rule(s)"); and

THE COURT, after considering the Motions, the briefs in opposition and support thereof, and other appropriate matters of record, CONCLUDES that the Defendants' Motion should be GRANTED, in part, and DENIED, in part, and Plaintiff's Motion should be DENIED, for the reasons stated herein.

*Marshall, Williams & Gorham, LLP by Matthew B. Davis, Esq., for Plaintiff.*

*Hogue Hill, LLP by David A. Nash, Esq., for Defendants Tote Glass, Inc. and Dennis M. Walsak.*

McGuire, Judge.

PROCEDURAL BACKGROUND

1.     Plaintiff Koch Measurement Devices, Inc. ("Plaintiff" or "KMDI") initiated this action on August 17, 2011, in New Hanover County, North Carolina. Plaintiff's First Amended Complaint was filed on October 10, 2011 ("Amended Complaint").

2.     The Amended Complaint asserts the following claims ("Claim(s)"): Breach of Duties of Care and Loyalty (against Armke) ("Claim One"); Breach of Fiduciary Duty (against Armke) ("Claim Two"); Constructive Fraud (against Armke) ("Claim Three"); Misappropriation of Trade Secrets (against all Defendants) ("Claim Four"); Unfair and Deceptive Trade Practices (against all Defendants) ("Claim Five"); Constructive Trust (against all Defendants) ("Claim Six "); Unjust Enrichment (against all Defendants) ("Claim Seven"); Conversion (against all Defendants) ("Claim Eight"); Breach of Contract (against Walsak) ("Claim Nine"); Civil Conspiracy (against all Defendants) ("Claim Ten"); and Punitive Damages (against all Defendants) ("Claim Eleven").

3.     On November 22, 2011, Defendant Tote Glass, Inc. ("Tote Glass") and Defendant Dennis M. Walsak, d/b/a Modular Graphics & Media ("Walsak") (collectively, "Defendants") filed their joint Answer to the Amended Complaint. Tote Glass and Walsak filed their Amended Answer, with leave of Court, effective April 17, 2013.

4.     On January 11, 2013, Tote Glass and Walsak filed their joint Motion to Dismiss the Amended Complaint pursuant to Rule 12(b)(6). On October 14, 2013, the Court entered its Order on Motion to Dismiss, denying Tote Glass and Walsak's Motion to Dismiss.[1]

5.     On May 29, 2013, all Claims and Counterclaims by and between Plaintiff and Defendant Angela Lee Armke, as the Executrix of the Estate of Kenneth W. Armke, II ("Armke") were voluntarily dismissed with prejudice. Accordingly, Claims One through Three

---

[1] 2013 NCBC 48 (N.C. Super. Ct. Oct. 14, 2013).

were dismissed in their entirety and Claims Four through Eleven were dismissed as to Armke.

6. On April 22, 2013, Plaintiff filed its Motion for Partial Summary Judgment, seeking entry of summary judgment on four issues: (a) that Armke owed Plaintiff a fiduciary duty; (b) that Armke breached this fiduciary duty; (c) that Armke benefited from such a breach; and (4) that Tote Glass, Walsak, and Armke engaged in conduct constituting unfair methods of competition in or affecting commerce which injured Plaintiff. Since Armke has been dismissed, Plaintiff's Motion is now exclusively with regard to its claim for violations of N.C. Gen. Stat. § 75-1.1. (hereinafter, references to the General Statues will be to "G.S.").

7. On May 30, 2013, Tote Glass and Walsak filed their Motion for Summary Judgment in their favor on all of Plaintiff's Claims asserted against them.

8. Following a conference call on December 23, 2014, counsel for all parties agreed to the Court deciding the Motions without oral argument.

9. The Motions have been fully briefed and are ripe for determination.

FACTUAL BACKGROUND

10. In ruling on a motion for summary judgment, a trial court does not make findings of fact. *Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142 (1975). The following factual background is summarized from facts that appear to the Court to be uncontested, or from allegations in the Amended Complaint, to provide context. Additional facts and contentions of parties, especially those that appear to the Court to be disputed, will be included in the Court's discussion of the Motions.

11. KMDI is a North Carolina corporation that was in the business of distributing imported glass beer growlers. KMDI was formed in 1996 as an importer and distributer of thermometers and weather instruments. KMDI also sold a number of products, including glass beer growlers, which were acquired following the acquisition of a company called Sun

Trading. In or around 2006, KMDI began exclusively distributing beer growlers wholesale.[2] KMDI purchased growlers from a German manufacturer, Wassman, and sold the growlers wholesales to breweries, brewpubs, and other retailers and resellers throughout the United States.[3]

12. Armke, now deceased, was an officer, director, and shareholder of KMDI from 1996 until his resignation in June 2011.[4] While employed with KMDI, Armke served as KMDI's president, secretary, treasurer, and as a director.[5] Moreover, for many years, Armke was KMDI's sole employee.[6] In his role with KMDI, Armke was charged with managing the company's day-to-day operations, including ordering inventory, negotiating with prospective customers, and filling customer orders.[7]

13. Tote Glass is a North Carolina corporation that is also in the business of distributing glass beer growlers. Tote Glass engages in business activities similar to Plaintiff.

14. Walsak is a citizen of Wilmington, North Carolina, and is the sole shareholder, director, and officer of Tote Glass.

15. Walsak is also the sole proprietor of Modular Graphics and Media, which is engaged in the business of graphic design, web design, and web hosting services.[8]

16. At some time in the late 1990s, Walsak and/or Modular Graphics were retained to create a website for KMDI.[9] This initial website creation included work directly related to KMDI's growler business.[10] Following that time, Walsak was responsible for providing web

---

[2] Am. Compl. ¶¶12, 15, 16; Answer ¶¶ 12, 15, 16.
[3] Am. Compl. ¶¶ 1, 6; Answer ¶¶ 1, 6.
[4] Am. Compl. ¶ 3; Answer ¶ 3.
[5] Am. Compl. ¶ 7; Answer ¶ 7.
[6] *Id.*
[7] *See* Am. Compl. ¶9; Aleman Dep. 43.
[8] Am. Compl. ¶ 4; Answer ¶ 4.
[9] Walsak Dep. 54.
[10] *Id.* at 32.

hosting services to KMDI, including the maintenance of KMDI's web hosting account with Godaddy.com.[11]

17.     Though the parties disagree as to the exact timing, sometime before Armke resigned from KMDI in June 2011, Walsak began to explore the possibility of entering the growler business.[12] Walsak incorporated Tote Glass on or about March 23, 2011, and originally intended to sell growlers only to retail customers and not to engage in wholesale distribution.[13] Tote Glass, however, never engaged in the retail business.[14] Armke made five loans totaling approximately $350,000.00 to Walsak so that Walsak could finance the start-up of Tote Glass.[15] Four of the five loans from Armke to Walsak were made before Armke's resignation from KMDI.[16] Several, if not all, of these loans from Armke to Walsak were to enable Tote Glass to pay specific invoices for Tote Glass's inventory.[17]

18.     In addition to providing loans to Walsak, Armke effectively ran the start-up of Tote Glass.  For example, Armke placed Tote's first order for growlers with KMDI's supplier, Wassman, in April 2011, before Tote Glass had secured its first customer.  The order was for pre-decorated growlers used by one of KMDI's customers, Hangar 24 Brewing.[18] Walsak testified that he had no input in ordering the growlers from Wassman and did not know Hangar 24 would become a customer of Tote Glass.[19]  Armke never informed KMDI that he was advising Tote Glass.[20]

---

[11] *Id.* 50.
[12] *See id.* 29.
[13] *Id.* 83-84, 114; Am. Compl. ¶ 21.
[14] Walsak Dep. 122.
[15] *Id.* 138, 157-58.
[16] *See id.*
[17] *Id.* 158.
[18] *Id.* 121, 140.
[19] *Id.* 142.
[20] Bruheim Aff. ¶ 40.

19. Additionally, Plaintiff contends that Armke diverted KMDI's inventory to Tote Glass, ceased placing orders for KMDI with its growler supplier, and transitioned KMDI's customers to Tote Glass.[21] The evidence establishes that Tote Glass ultimately filled at least seven orders from KMDI's customers placed with KMDI.[22] There are facts in the record to suggest that Armke diverted to Tote Glass virtually all of KMDI's customers and business during the last few months of his employment.

20. On or about June 13, 2011, Armke resigned his position with KMDI.[23] Shortly before this time, Armke activated an out-of-office notification which indicated to Plaintiff's customers or others that attempted to communicate with Plaintiff that KMDI would be closed from June 7 through June 13.[24] Following Armke's resignation, personal property belonging to KMDI and entrusted to Armke, including computer equipment and customer files, were missing from a KMDI office to which only Armke had access.[25] On June 14, 2011, Armke began working for Tote as an "unpaid consultant."[26]

21. Tote Glass first began contacting potential customers on June 14, 2011.[27] Within three months after Armke's resignation from KMDI, Tote Glass had 104 wholesale customers, 86 of which had been KMDI customers, and almost $600,000.00 in gross sales. KMDI was driven out of the growler business.[28]

22. Walsak claims that he did not intentionally engage in any conduct designed to divert KMDI's business to Tote Glass. He testified that he believed Armke was the owner of KMDI, and was merely assisting him in starting up Tote Glass with the idea that Tote would

---

[21] *See* Pl.'s Br. Supp. Mot. Partial Summ. J. 2-12.
[22] Bruheim Aff. ¶¶ 28-35, Exs. C-H.
[23] Am. Compl. ¶44.
[24] *Id.*
[25] Bruheim Dep. 173.
[26] Walsak Dep. 130.
[27] *Id.* 117.
[28] Walsak Dep. 118-119, Ex. 15; Rickert Aff. Ex. A.

exclusively be a retail growler distributor, would buy its growlers from KMDI, and would not be a competitor of KMDI. Walsak claims that Tote Glass only decided to get into the wholesale growler business once Armke told him that there was a dispute among KMDI's shareholders that might cause Tote Glass to be unable to obtain growlers from KMDI. Walsak denies that he and Armke had any type of agreement or plan to engage in unfair, deceptive, or unlawful conduct, and denies that Tote Glass knowingly converted any of KMDI's property.[29]

## DISCUSSION

23. Pursuant to Rule 56(a), Plaintiff moves for partial summary judgment in its favor as to its claim against Tote Glass and Walsak for unfair and deceptive trade practices under G.S. §75-1.1. Pursuant to Rule 56(b), Defendants Tote Glass and Walsak move for summary judgment as to each of Plaintiff's remaining claims. The Court will first address Defendants' Motion, followed by Plaintiff's Motion.

24. "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.'" *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523 (2012) (quoting Rule 56(c)). An issue is "material" if its "resolution . . . is so essential that the party against whom it is resolved may not prevail." *McNair v. Boyette*, 282 N.C. 230, 235 (1972) (quotations omitted). The moving party bears "the burden of clearly establishing lack of a triable issue" to the trial court. *N.C. Farm Bureau Mut. Ins. Co. v. Sadler*, 365 N.C. 178, 182 (2011) (quoting *N.C. Nat'l Bank v. Gillespie*, 291 N.C. 303, 310 (1976)). The moving party may meet this burden by "proving an essential element of the opposing party's claim

---

[29] Defs.' Br. Supp. Mot. Summ. J. 4-5, 15-18, 25-26.

does not exist, cannot be proven at trial, or would be barred by an affirmative defense." *Variety Wholesalers, Inc.,* 365 N.C. at 523 (quoting *Dobson v. Harris*, 352 N.C. 77, 83 (2000)).

<u>Defendants' Motion for Summary Judgment</u>

*Claim Four – Misappropriation of Trade Secrets*

25.     Defendants move for summary judgment in their favor on Plaintiff's claim for misappropriation of trade secrets. Defendants contend that Plaintiff "has failed to establish that the information allegedly misappropriated by [Defendants] constitutes 'trade secrets'" under North Carolina law.[30]

26.     A threshold question in any action involving allegations of misappropriation of trade secrets is whether the information in question constitutes a trade secret under the Trade Secret Protection Act, G.S. § 66-152, *et seq.* ("Act").  *Combs & Assocs. v. Kennedy*, 147 N.C. App. 362, 369 (2001).

27.     The Act defines what constitutes a "trade secret."  G.S. § 66-152(3) provides that:

"Trade secret" means business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:

(a)     Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by person who can obtain economic value from its disclosure or use; and

(b)     Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

---

[30] Defs.' Mot. Summ. J. ¶ 1.

28.     North Carolina appellate courts have articulated the following six factors that should be considered when determining whether information is a trade secret:

(a)     The extent to which the information is known outside the business;

(b)     The extent to which it is known to employees and others involved in the business;

(c)     The extent of measures taken to guard the secrecy of the information;

(d)     The value of the information to the business and its competitors;

(e)     The amount of effort or money expended in developing the information; and

(f)     The ease or difficulty with which the information could properly be acquired or duplicated by others.

*Combs*, 147 N.C. App. at 369-70.

29.     Here, Plaintiff contends that the following information constitutes trade secrets under North Carolina law: Plaintiff's customer lists, ordering habits, history and needs of Plaintiff's customers, and Plaintiff's pricing and inventory management strategies.[31]

30.     At the outset, Defendants contend that Plaintiff's trade secrets as pleaded in the Amended Complaint lack the specificity required under North Carolina law. *See Washburn v. Yadkin Valley Bank & Trust Company*, 190 N.C. App. 315, 327 (2008) (dismissing trade secret claim under Rule 12(b)(6) where party failed to allege "with sufficient specificity the trade secrets . . . allegedly misappropriated"). However, in the Order on Motion to Dismiss entered in this matter, the Court rejected this contention, finding that Plaintiff sufficiently the alleged trade secrets at issue in this case to satisfy Rule 12(b)(6).[32] Similarly, on the record before the Court at this stage, it appears that Plaintiff's alleged trade secrets

---

[31] Am. Compl. ¶ 18; Bruheim Aff. ¶¶ 16, 18-22.
[32] 2013 NCBC 48 (N.C. Super. Ct. Oct. 14, 2013) ¶ 19.

have been sufficiently identified such that Defendants have notice of what they stand accused of misappropriating. *See Visionair, Inc. v. James*, 167 N.C. App. 504, 510 (2004).

31.     In their Motion for Summary Judgment, Defendants argue that Plaintiff's misappropriation of trade secrets claim fails because Plaintiff cannot show, first, that the information described as trade secrets could not have easily been compiled by someone outside KMDI and, second, that there were sufficient efforts taken to safeguard the secrecy of this information.[33] The Court will address these two contentions before returning to the remaining factors set out in *Combs*.

32.     Our Court of Appeals has noted that information will not constitute a trade secret if that information could be easily compiled by someone in the industry through public listings, such as trade show and attendance lists, *see Combs*, 147 N.C. App. at 370, or through a telephone directory, *see Novacare Orthodics & Prosthetics E., Inc. v. Steelman*, 137 N.C. App. 471, 478 (2000). The focus of this requirement is generally on the amount of effort expended, including both time and money invested, in compiling the trade secret information. For instance, this Court has previously held that information collected in the routine course of business, without any efforts to compile, develop, or maintain the information, did not constitute a trade secret. *See Edgewater Services, Inc. v. Epic Logistics, Inc.*, 2009 NCBC 20 (N.C. Super. Ct. Aug. 11, 2009). Conversely, the Court of Appeals has held that where an individual maintains a compilation of detailed records over a significant period of time, those records could constitute a trade secret even if "similar information may have been ascertainable by anyone in the . . . business." *Byrd's Lawn & Landscaping, Inc. v. Smith*, 142 N.C. App. 371, 376 (2001); *see also Sunbelt Rentals, Inc. v. Head & Enquist Equip., LLC*, 174 N.C. App. 49, 55 (2005) (recognizing that, under the facts of that case, compilation of

---

[33] Defs.' Br. Supp. Mot. Summ. J. 9-12.

information including identity of customers, customer-specific pricing, and historic customer demand constituted a trade secret).

33.     Here, the undisputed facts in the record reveal that much of the information alleged to constitute Plaintiff's trade secrets, including customer-specific pricing, shipping and inventory management strategies, and years of customer usage data, is not publicly available.[34] Further, Plaintiff has introduced evidence that its confidential information, specifically as to customer pricing and historic demand, was developed only after several years of serving the same customers and developing an in-depth understanding as to their specific product needs.[35] Additionally, undisputed facts in the record indicate that Plaintiff's inventory management strategy was developed over a period of fifteen years, indicating a substantial investment of time and resources on Plaintiff's part.[36] On these facts, the Court finds this case analogous to *Byrd Lawn & Landscaping*, and finds its decision in *Edgewater Services* readily distinguishable. As in *Byrd Lawn & Landscaping*, although "similar information may have been ascertainable by anyone in the [beer growler] business," the compilation of this data over such a long period of time, at a minimum, creates an issue of fact as to whether this information constitutes a trade secret. *Byrd Lawn & Landscaping*, 142 N.C. App. at 376.

34.     Defendants next contend that Plaintiff cannot show that reasonable efforts were taken to safeguard the secrecy of this information. In order for information to qualify as a trade secret, G.S. § 66-152(3)(b) requires that the information be "the subject of efforts that are reasonable under the circumstances to maintain its security." This requirement is

---

[34] Bruheim Aff. (Feb. 28, 2013) ¶¶ 16, 18-22 (noting confidentiality of customer-specific pricing and historic demand, in addition to the commercial value of same). *See also* Nab Dep. 31.
[35] Aleman Dep. 27-28 (noting that KMDI tracked inventory and ordering needs of Granite City, a KMDI customer, over four years).
[36] Bruheim Aff. (Feb. 28, 2013) ¶¶ 11, 16 (testifying that growler inventory management strategy was developed over a period of fifteen years).

necessarily fact dependent, and courts that have addressed it closely examine the circumstances surrounding the trade secret to determine what measures are reasonable. *See Edgewater Services*, 2009 NCBC 20 at ¶ 28 (recognizing that maintaining files in an unlocked room, accessible to all employees without safeguards to ensure security, was not reasonable under the circumstances); *Combs*, 147 N.C. App. at 369 (finding lack of reasonable efforts to maintain secrecy where claimed trade secrets were freely disseminated) .

35.    Here, the undisputed evidence shows that Plaintiff maintained its customer files in locked file cabinets and used password protected software to track its inventory and customer sales and pricing.[37] Moreover, for several years, Armke was Plaintiff's sole employee, thus largely eliminating the concern of access by unauthorized employees expressed in *Edgewater Services*. Additionally, while employed by KMDI, Armke was subject to a non-disclosure agreement included as part of his Employment Agreement.[38] Ultimately, given that Armke was Plaintiff's sole employee for much of the time period at issue and that Plaintiff maintained its confidential information in locked cabinets or protected the same by password, the Court cannot conclude, as a matter of law, that Plaintiff failed to take reasonable efforts to maintain the secrecy of this confidential information.

36.    Turning to the remaining factors articulated in *Combs*, evidence in the record supports Plaintiff's contention that the information, particularly the inventory management strategy, customer ordering patterns, and historic customer pricing, was highly valuable to Plaintiff's business and likely was used to launch Tote Glass' successful business. This information would allow a rival firm to have a competitive advantage over Plaintiff by allowing the firm to anticipate, and potentially undercut, Plaintiff's historic pricing and bidding. *See Byrd's Lawn & Landscaping, Inc.*, 142 N.C. App. at 375 (recognizing the

---

[37] *Id*. ¶ 8; Bruheim Dep. 135.
[38] *See* Armke's Ans. to Am. Compl. Ex. C.

competitive advantage that would be provided by the ability to predict a competitor's bid). Additionally, evidence in the record suggests that this information is not known outside the business,[39] and, as discussed more fully above, it would be difficult to quickly compile the information by another in the industry.[40]

37. Defendants do not argue that Plaintiff has failed to make a *prima facie* case of misappropriation by showing that Defendants: (1) knew or should have known of the trade secrets; and (2) had a specific opportunity to acquire them for use or has used them without the consent or authority of the owner. *Combs*, 147 N.C. App. at 369. Instead, as discussed above, there is substantial evidence in the record to support Plaintiff's claim of misappropriation of trade secrets.[41] Accordingly, as to Claim Four, Defendants' Motion for Summary Judgment should be DENIED.

*Claim Five – Violations of G.S. § 75-1.1*

38. Defendants also seek summary judgment in their favor as to Claim Five. In Claim Five, Plaintiff alleges that the conduct of Defendants as set forth in the Amended Complaint constitutes a violation of G.S. § 75-1.1. The North Carolina Court of Appeals has recognized that a misappropriation of trade secrets can constitute a violation of G.S. § 75-1.1. *Drouillard v. Keister Williams Newspaper Servs., Inc.*, 108 N.C. App. 169 (1992). Accordingly, because the Court has concluded that summary judgment in Defendants' favor is improper on Plaintiff's claim for misappropriation of trade secrets, the Court concludes that summary

---

[39] *See* Bruheim Aff. ¶ 16 (testifying that inventory management strategy "was not generally known outside KMDI"); *id.* ¶ 20 (testifying, similarly, that "customer usage rates, order histories, and product pricing was not generally known outside KMDI").

[40] *See supra* ¶¶ 32-33.

[41] *See* Walsak Dep. 121, 143 (testifying that he had knowledge of historic pricing and demand and, through the use of that pricing, was able to anticipate orders from former KMDI customers).

judgment on Plaintiff's G.S. § 75-1.1 claim is also inappropriate. Accordingly, as to Claim Five, Defendants' Motion for Summary Judgment should be DENIED.[42]

*Claim Eight – Conversion*

39.     In Claim Eight, Plaintiff alleges that Defendants "converted (i) KMDI's inventory and growlers; (ii) the email account kenarmke@coach-usa.com [*sic*] and any and all emails, information and documents associated with that account; (iii) certain computer equipment, hard drives and web server; and (iv) client files."[43]

40.     In North Carolina, conversion is defined as: "(1) the unauthorized assumption and exercise of the right of ownership; (2) over the goods or personal property; (3) of another; (4) to the exclusion of the rights of the true owner." *Estate of Graham v. Morrison*, 168 N.C. App. 368, 371 (2005). "At its core, conversion 'is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner . . . .'" *Tai Sports, Inc. v. Hall*, 2012 NCBC 62, ¶ 108 (N.C. Super. Ct. Dec. 28, 2012) (quoting *Lake Mary L.P. v. Johnston*, 145 N.C. App. 525, 532 (2001)). The North Carolina Court of Appeals has held that there are "two essential elements [that] are necessary in a complaint for conversion – there must be ownership in the plaintiff and a wrongful conversion by defendant." *Lake Mary, L.P.*, 145 N.C. App. at 532.

41.     Beginning with the kenarmke@koch-usa.com email account, it appears undisputed that, following Armke's departure from KMDI, Plaintiff was unable to access this email account and was unable to locate any emails associated with that account.[44] Additionally, it is undisputed that this email address appears on Walsak's webhosting

---

[42] By this conclusion the Court does not intend to suggest that there is no other evidence, in addition to the evidence supporting misappropriation of trade secrets, to support Plaintiff's claim under G.S. § 75-1.1.
[43] Am. Compl. ¶ 96.
[44] Bruheim Aff. ¶¶ 25-26.

contract with KMDI.[45] However, Walsak has testified that, under the hosting agreement with Godaddy.com, he did not have any access to the email accounts or web servers associated with that account.[46] Plaintiff has not provided any evidence that would contradict Walsak's testimony that he did not have the ability to cause the disappearance of the email account in question. As such, it appears to the Court that the inability of Walsak to remove, and therefore convert, any email address of KMDI is uncontroverted. Accordingly, as to the alleged conversion of kenarmke@koch-usa.com, and any related emails, Defendants' Motion should be GRANTED.

42.    Regarding the computer hardware and client files alleged to have been converted from KMDI offices, the uncontroverted evidence tends to show that Armke's desktop computer, the hard drive from a laptop computer, and an office server were removed from an office from which Armke was "the only person who had access. . . ."[47] Nothing in the record provides any evidence to suggest that Walsak and/or Tote Glass were involved with the removal of these items. Accordingly, as to the alleged conversion of computer hardware and client files, Defendants' Motion should be GRANTED.

43.    In support of their Motion for Summary Judgment on Plaintiff's claim for conversion of growlers, Defendants direct the Court to the testimony of Walsak that Tote Glass did not fill a July 1, 2011, order with KMDI inventory.[48] However, sales records of Tote Glass tend to show that while the July 1, 2011, order was shipped to a pre-decorated growler customer, inventory records do not reflect the existence of any of that customer's growlers in Tote's inventory as of the date of that shipment.[49] Such a transaction, a sale by Tote Glass

---

[45] *See* Walsak Dep., Ex. 1.
[46] Walsak Dep. 35.
[47] KMDI 30(b)(6) Dep. 173.
[48] Walsak Dep. 167.
[49] *See* Walsak Dep.163-68, *id.* Ex. 15, 19-21

without any inventory on hand, raises an issue of fact as to the origin of the growlers used to fill that order. Moreover, Plaintiff also presented evidence that, in the early days of Tote Glass and the waning days of Armke's involvement with KMDI, KMDI sold 720 growlers to a company that had filed for Chapter 7 bankruptcy more than one year prior to the order and shipment.[50] Further, the terms of that sale, differing from KMDI's usual transactions with the purported purchaser, raise a number of questions regarding the sale's authenticity.[51] Accordingly, the Court finds that genuine issues of material fact exist regarding Plaintiff's claim for conversion of KMDI's growlers and, therefore, Defendant's Motion for Summary Judgment regarding the conversion of growlers should be DENIED.

*Claim Nine – Breach of Contract*

44.	In its Ninth Claim, Plaintiff has asserted a Breach of Contract claim against Walsak based on a contract between Plaintiff and Walsak whereby Walsak was to provide KMDI with webhosting services.[52] Defendants argue that Plaintiff has not proved the existence of any provision in that contract that would prohibit Walsak from undertaking the acts of which Plaintiff now complains.

45.	To prove a claim for breach of contract, a plaintiff must show: (1) a contractual agreement; (2) breach of that agreement by the defendant; and (3) resulting damage to the plaintiff. *See McLamb v. T.P. Inc.*, 173 N.C. App. 586, 588 (2005). Moreover, "[t]o constitute a valid contract, the parties must assent to the same thing, their minds must meet as to all essential terms." *Braun v. Glade Valley School, Inc.*, 77 N.C. App. 83, 89 (1985).

46.	It is undisputed that KMDI and Walsak entered into a contractual agreement whereby Walsak would provide website hosting services to KMDI.[53] The express terms of that

---

[50] *See* Pl.'s Br. Opp. Defs.' Mot. Summ. J. Ex. III.
[51] *See id.*
[52] Am. Compl. ¶¶ 100-04.
[53] *See* Walsak Dep. Ex. 1.

contract, however, do not limit Walsak's ability to engage in any business that competes with KMDI, or otherwise undertake any of the actions Walsak is alleged to have taken in this action. Plaintiff has presented no evidence of any other agreement between it and Walsak that would have expressly prohibited Walsak's alleged actions.

47. Apparently acknowledging this, Plaintiff argues that the implied duty to perform contractual obligations in good faith imposes an obligation on Walsak to refrain from competing or otherwise undertaking the alleged actions in this action. While North Carolina courts do imply an obligation on contracting parties to "act upon principles of good faith and fair dealing," such an obligation only operates "to accomplish the purpose of an agreement." *See Maglione v. Aegis Family Health Ctrs.*, 168 N.C. App. 49, 56 (2005). As this Court has noted, such a claim "requires the wrongful intent of a party to deprive another party of its contractual rights." *Hamm v. Blue Cross & Blue Shield of N.C.*, 2010 NCBC 14, ¶ 80 (N.C. Super. Ct. Aug. 27, 2010).

48. Here, it is undisputed that the agreement between KMDI and Walsak was for web hosting services. It is further undisputed that, in November 2005, Walsak's role in running KMDI's website was limited by a change in the way those services were provided to KMDI.[54] Plaintiff has offered no evidence to suggest that Walsak breached the express terms of their agreement, or that Walsak failed to act in good faith in providing web hosting services.

49. Plaintiff contends, and it is undisputed, that Walsak sent Armke a number of files relating to KMDI's website in February or March of 2011 while Armke was still employed with KMDI. Plaintiff has provided no evidence that this was in breach of the parties' contract or to otherwise rebut Walsak's testimony that this was a legitimate business

---

[54] *See* Walsak Dep. 32, 34.

transaction related to his contract with Plaintiff.[55] Moreover, despite its assertion to the contrary, Plaintiff has directed the Court to no evidence supporting its claim that Walsak deleted any e-mail accounts associated with KMDI or removed KMDI's website from the Internet.[56]

50. Ultimately, Plaintiff has failed to show a genuine issue of material fact as to the existence of any contractual provision prohibiting Walsak from competing with Plaintiff, or that Walsak breached the implied covenant of good faith and fair dealing such that Plaintiff was deprived of any right under the webhosting contract. *See Hamm,* 2010 NCBC 14, ¶ 80. As such, Defendants' Motion as to Plaintiff's Claim for Breach of Contract should be GRANTED.

*Claim Ten – Civil Conspiracy*

51. In Claim Ten, Plaintiff alleges that Tote Glass and Walsak, together with Armke, "conspired and otherwise entered into an agreement, either express or implied, whereby they would exploit Armke's fiduciary relationship with KMDI to divert KMDI's opportunities, assets, and good will to Tote Glass, and to otherwise frustrate and interfere with KMDI's ability to conduct business."[57]

52. In North Carolina, the elements of civil conspiracy are: (1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to the plaintiff; (4) pursuant to a common scheme. *Privett v. Univ. of N. Carolina*, 96 N.C. App. 124, 139 (1989). To establish a claim, the plaintiff must show an "overt act" committed by at least one conspirator in furtherance of the conspiracy. *Dove v. Harvey*, 168 N.C. App. 687, 690 (2006).

---

[55] Walsak Dep. 53-54.
[56] *See* Pl.'s Br. Opp. Defs.' Mot. Summ. J. 23.
[57] Am. Compl. ¶ 106.

53. As North Carolina courts have regularly recognized, "there is not a separate civil action for civil conspiracy in North Carolina." *Piraino Brothers, LLC v. Atlantic Financial Group, Inc.*, 211 N.C. App. 343, 350 (2011) (citing *Dove v. Harvey*, 168 N.C. App. 687, 690 (2005)). Instead, liability for "civil conspiracy is premised on the underling act." *Id*. Accordingly, North Carolina courts have held that a "civil conspiracy claim is subject to dismissal when the underlying causes of action, which contain the alleged wrongful acts, are dismissed." *Anderson v. Coastal Cmtys. at Ocean Ridge Plantation, Inc.*, 2012 NCBC 33, ¶ 73 (N.C. Super. Ct. May 30, 2012); *see also Piraino Bros., LLC*, 211 N.C. App. at 350 (noting that "[b]ecause the underlying tort claim was dismissed, the trial court properly granted summary judgment [on the same defendant's] ancillary civil conspiracy claim").

54. Here, both as pleaded and as argued in its briefing, Plaintiff's claim for civil conspiracy is based entirely on Armke's alleged breach of fiduciary duty.[58] The claim for breach of fiduciary duty against Armke has been dismissed by Plaintiff. The Court concludes that North Carolina law mandates dismissal of Plaintiff's claim for civil conspiracy, which is based on the breach of fiduciary duty. *See id*.

55. Moreover, even if dismissal of Plaintiff's civil conspiracy is not required, Plaintiff has presented no evidence to contradict the testimony of Walsak that no agreement, other than five promissory notes, ever existed between Walsak and Armke.[59] Even if Armke assisted Walsak in operating Tote Glass, Plaintiff has presented no evidence that this assistance was provided pursuant to an agreement to breach Armke's duties to Plaintiff. Instead, Plaintiff relies on speculation concerning the promissory notes between Armke and

---

[58] *See* Am. Compl. ¶ 106; Pl.'s Br. Opp. Defs.' Mot. Summ. J. 15 (describing evidence Plaintiff contends shows "that Tote Glass, Walsak, and Armke agreed to exploit Armke's fiduciary relationship with KMDI").

[59] Walsak Aff. ¶ 14.

Walsak, and other evidence that Armke breached his fiduciary duties owed to Plaintiff.[60]

Even if Plaintiff had a once cognizable claim against Armke for breach of fiduciary duty, such claim has been voluntarily dismissed. Plaintiff has failed to show the existence of an agreement to breach that fiduciary duty such that Tote Glass and Walsak may be held liable for civil conspiracy. Accordingly, as to Claim Ten, Defendants' Motion for Summary Judgment should be GRANTED.

> *Claims Six, Seven, and Eleven – Constructive Trust, Unjust Enrichment, and Punitive Damages*

56.     In Claim Six, Plaintiff seeks the imposition of a constructive trust on the assets, benefits, and corporate opportunities of Plaintiff of which Defendants have wrongfully availed themselves. Defendants move for summary judgment in their favor on Claim Six based, in large part, on the absence of "evidence that Walsak or Tote [Glass] obtained legal title to any property through breach of their duty, fraud[,] or any other circumstances making it inequitable for them to retain it against [Plaintiff's] claims."[61]

57.     A constructive trust, under North Carolina law,

> is a duty, or relationship, imposed by courts of equity to prevent the unjust enrichment of the holder of title to, or of an interest in, property which such holder acquired through fraud, breach of duty or some other circumstance making it inequitable for him to retain it against the claim of the beneficiary of the constructive trust.

*Varsity Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 530 (2012) (quoting *Wilson v. Crab Orchard Dev. Co.*, 276 N.C. 198, 211 (1970)). Though a constructive trust usually follows from a breach of fiduciary duty, such a duty is not required for the Court to exercise its equitable authority in the imposition of a constructive trust. The imposition of

---

[60] *See* Pl.'s Br. Opp. Defs.' Mot. Summ. J. 15.
[61] Defs.' Br. Supp. Mot. Summ. J. 25.

a constructive trust lies in the discretion of the trial court. *Kinlaw v. Harris*, 364 N.C. 528, 532 (2010).

58.     Here, Plaintiff has not brought any claim for breach of fiduciary duty or constructive fraud against these Defendants, and those claims brought against Armke have been dismissed. Nevertheless, in *Varsity Wholesalers*, the Supreme Court recognized that a constructive trust could be proper in the absence of such allegations and claims in the context of an action for conversion. The Supreme Court noted that the "continued acceptance of [property where there was a dispute as to the ownership of that property] could be considered unconscientious or inequitable and could thus permit the imposition of a constructive trust." *Variety Wholesalers, Inc.*, 365 N.C. at 531. Because the Court has found that there are genuine issues of material fact as to Plaintiff's claim for conversion, the Court concludes that issues of fact remain as to Plaintiff's entitlement to a constructive trust. Accordingly, the Court finds that Defendants' Motion for Summary Judgment as to Claim Six should be DENIED.

59.     In Claim Seven, Plaintiff alleges that Defendants, by retaining the assets, benefits, and corporate opportunities conveyed upon them, have been unjustly enriched at Plaintiff's expense.

60.     In North Carolina, to recover on a claim of unjust enrichment, Plaintiff must prove: (1) that it conferred a benefit on another party; (2) that the other party consciously accepted the benefit; and (3) that the benefit was not conferred gratuitously or by an interference in the affairs of the other party. *Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 330 (2002). "A claim of this type is neither in tort nor contract but is described as a claim in quasi contract or a contract implied in law." *Booe v. Shadrick*, 322 N.C. 567, 570 (1988). "The doctrine of unjust enrichment was devised by equity to exact the return of, or payment for, benefits received under circumstances where it would be unfair for the recipient to retain

them without the contributor being repaid or compensated." *Collins v. Davis*, 68 N.C. App. 588, 591 (1984).

61.     Here, as noted above, issues of fact remain as to whether Defendants converted personal property of Plaintiff or misappropriated Plaintiff's trade secrets. If proven, such actions would likely constitute a benefit conferred on Defendants "under circumstances where it would be unfair for [Defendants] to retain them." *Id.* Accordingly, the Court concludes that issues of fact remain as to Plaintiff's entitlement to recover in unjust enrichment and, therefore, Defendants' Motion for Summary Judgment should be DENIED as to Claim Seven.[62]

62.     In Claim Eleven, Plaintiff seeks punitive damages. Punitive damages may be awarded if a claimant is entitled to compensatory damages and proves, by clear and convincing evidence, that fraud, malice, or willful or wanton conduct contributed to the injury. G.S. § 1D-15. The Court finds that disputed issues of material fact exist as to Plaintiff's entitlement to punitive damages and, therefore, Defendants' Motion for Summary Judgment as to Claim Eleven should be DENIED.

## Plaintiff's Motion for Partial Summary Judgment

63.     The Court has denied Defendants' Motion as to Plaintiff's claim for unfair and deceptive trade practices under G.S. § 75-1.1 on the basis that there are facts supporting Plaintiff's claim, but concludes that genuine issues of material fact exist as to Plaintiff's G.S.

---

[62] The Court recognizes that Plaintiff's claim for unjust enrichment is somewhat unique in that the "benefit conferred" on Defendants, the alleged use of Plaintiff's confidential information and inventory, was not voluntarily conferred. Nevertheless, the Court concludes that issues of fact remain as to the circumstances surrounding the alleged conferral of these benefits, particularly as to whether those benefits were conferred by an agent of Plaintiff, that make entry of summary judgment in Defendants' favor improper.

§ 75-1.1 claim. Accordingly, the Court concludes that Plaintiff's Motion for Summary Judgment should also be DENIED.

THEREFORE, IT IS ORDERED THAT:

64.     As to Claim Four, Defendants' Motion for Summary Judgment is DENIED.

65.     As to Claim Five, Defendants' Motion for Summary Judgment is DENIED.

66.     As to Claim Six, Defendants' Motion for Summary Judgment is DENIED.

67.     As to Claim Seven, Defendants' Motion for Summary Judgment is DENIED.

68.     As to Claim Eight, Defendants' Motion for Summary Judgment is GRANTED, in part, and DENIED, in part, as outlined in paragraphs 39-43 above.

69.     As to Claim Nine, Defendants' Motion for Summary Judgment is GRANTED.

70.     As to Claim Ten, Defendants' Motion for Summary Judgment is GRANTED.

71.     As to Claim Eleven, Defendants' Motion for Summary Judgment is DENIED.

72.     Plaintiff's Motion for Summary Judgment is DENIED.

This the 1st day of May, 2015.